David TIDD, Appellant

v.

LOWER SAUCON TOWNSHIP ZON-
ING HEARING BOARD, Green Gable
Investment Partners, LP, and Lower
Saucon Township.

Commonwealth Court of Pennsylvania.

Argued March 11, 2015.
Decided May 29, 2015.

James F. Preston, Bethlehem, for appellant.

George A. Heitczman, Bethlehem, for appellee Lower Saucon Township Zoning Hearing Board.

Thomas J. Schlegel, Center Valley, for appellee Green Gable Investment Partners, LP.

BEFORE: DAN PELLEGRINI, President Judge and BONNIE BRIGANCE LEADBETTER, Judge, ROBERT SIMPSON, Judge, MARY HANNAH LEAVITT, Judge, P. KEVIN BROBSON, Judge, PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge ROBERT SIMPSON.

In this zoning appeal, David Tidd (Objector) asks whether the Lower Saucon Township Zoning Hearing Board (ZHB) erred in granting Green Gables Investment Partners, LP's (Applicant) request for a dimensional variance from the Lower Saucon Township Zoning Ordinance's (zoning ordinance) requirement that all areas used to corral or pasture horses be at least 100 feet from all lot lines. Because the ZHB's findings are amply supported by the record and because, as recently restated by our Supreme Court in *Marshall v. City of Philadelphia*, 626 Pa. 385, 97 A.3d 323 (2014), we must afford substantial deference to those findings, particularly the determination that Applicant satisfied the unnecessary hardship criterion, we decline to disturb the ZHB's decision granting the requested dimensional variance. Thus, we affirm.

## I. Background

Kathleen Mills (Mrs. Mills) is the sole owner of Applicant, which owns the prop-

erty located at 2142 Leithsville Road (subject property). The subject property, which is comprised of 24.622 acres and is currently vacant, lies in a Rural Agricultural (RA) zoning district.

Mrs. Mill's daughter, Kathryn Mills (Ms. Mills), and Ms. Mills' husband, Luke Dellmyer (Dellmyer), seek to operate a horse farm and riding business on the subject property, which is a permitted use in an RA zoning district. *See* Section 180-19(A)(1)(b) of the zoning ordinance. The subject property is bordered entirely by a 40-foot tree line. Another tree line essentially bisects the subject property. The subject property is also encumbered by an extensive utility easement.

In November 2012, Applicant filed an application for a variance from Section 180-103(B)(2) of the zoning ordinance, which states: "All buildings used to shelter horses and all areas used to corral or pasture horses shall be at least 100 feet from all lot lines (except along roads)." *Id.*

The ZHB held a hearing on Applicant's dimensional variance request.[1] In support of its request, Applicant presented the testimony of three witnesses: Mrs. Mills, Ms. Mills and Dellmyer. They testified in relevant part as follows.

Lucky Shoe Farms, a business owned by Ms. Mills, Mrs. Mills' daughter, seeks to operate a horse and riding business on the subject property once the improvements are constructed. Also, Ms. Mills and her family will occupy a residence on the subject property.

Ms. Mills testified the business is "[g]eared toward educating riding for people interested in showing or competing nationally as well as locally, riding facility for boarding, training horses, and riding lessons." ZHB Hearing, Notes of Testimony (N.T.), 12/17/12, at 8; Reproduced Record (R.R.) at 16a. Applicant proposes to construct a barn that would contain 26 stalls. Applicant does not intend to keep the maximum number of horses permitted by the zoning ordinance on the subject property, and it is willing to condition any zoning relief on having a number of horses less than the amount permitted by right under the zoning ordinance.[2] Specifically, based on the size of the subject property, Applicant could keep 52 horses on the subject property by right under the zoning ordinance. However, Applicant would agree to limit the number of horses on the subject property to a maximum of 36.

Although Ms. Mills previously worked at areas with "far less pastures and more horses," the 14 pastures proposed is the appropriate number of pastures to operate

1. The ZHB noted Applicant's variance request was limited to the setback requirement for pasture areas. It stated Applicant's preliminary site plan, which was not yet approved, showed a number of structures which might, depending on final siting, also need zoning relief. However, the only matter before it was Applicant's request for a variance from the setback requirement.

2. In the operation of Lucky Shoe Farm, the hours that the horses are outside is dictated by the horses' comfort and the agricultural purpose of the grass. In the summer, the horses will go outside at approximately 6:00 p.m. to 7:00 p.m. and return inside at approx-

imately 6:00 a.m. to 7:00 a.m. In the winter, the horses go outside at approximately 7:00 a.m. and return at approximately 1:00 p.m., depending on the severity of the cold weather. There would be approximately three or four horses per pasture, which would ensure the horses do not produce too much manure, which would in turn produce more grass. Regarding the manure, Lucky Shoe Farms will have an area sanctioned for manure removal. Someone will come on a weekly basis to completely remove the manure in all of the stalls. The manure in the pastures will be graded with the harrow on a monthly basis.

the farm successfully. N.T. at 16; R.R. at 24a. Additionally, the number of pastures reflects Applicant's attempt to have a limited number of horses per pasture to maximize the grass remaining at the subject property. As a condition of obtaining approval for the variance, Applicant would limit tree removal to two cuts in the tree line that bisects the subject property in order to allow horses to get to the lower pastures.

For his part, Dellmyer testified that he and Ms. Mills will live in a residence built on the subject property, and they will work together at Lucky Shoe Farms. Dellmyer described the subject property as follows:

> The [subject property] is roughly 25 acres. The whole property pretty much has roughly about a 40-foot tree line around the border of the [subject] property. Then there is another tree line that passes through the middle of the [subject] property pretty much exactly in the middle. There is a passage open to the easterly side, maybe about 50 foot wide for the power line and gasline easement which also intersects at the top of the property line where it continues up through Saddle Ridge Development.

N.T. at 11; R.R. at 19a. The subject property does not currently contain any improvements. Rather, it is currently farmed for summer wheat.

As to the proposed improvements on the subject property, Applicant plans to initially build an agricultural building in which it would store equipment used to maintain the pastures. Applicant intends to have eight large pastures, two medium pastures, and four "turn-out" pastures. N.T. at 13; R.R. at 21a.

Applicant requires zoning relief for the western side of the proposed northwestern most pasture because that pasture would be 69 feet from the boundary line and the zoning ordinance requires a 100-foot setback. Additionally, the top two pastures south of the proposed stable in the riding area are both 69 feet from the western boundary. On the southern part of the subject property, the proposed fence is 54 feet from the boundary line at its closest point. Further, the eastern pastures at the northern part of the subject property are both 80 feet from the boundary line. The proposed southernmost pasture on the western boundary line satisfies the 100-foot setback requirement.

Dellmyer also offered the following testimony on direct examination:

Q. Is there anything unique about the property that makes having the pastures in this location appropriate?

A. Sure. We had spoke about this in the last meeting as well. *Originally we had thought about maybe clearing out some of the trees at the property line to exercise the horses.* The more we stepped back to look at the property, it is so unique to keep the tree line and would be nice if we can move the pastures into the tree line to maximize the pasture.

*With that 100 feet, I believe we lost about six and a half acres total.* So even without—in order to keep the uniqueness of the property, we would like in return to get the variance to make the pastures a little bit bigger and get more usable land.

Q. *Am I correct that you could put a parameter [sic] fence on the boundaries, not something that would be corralling horses?*

A. *Correct.*

Q. *To do that, would you have to remove the same amount of trees?*

A. *Exactly.*

Q. Makes sense. Would you agree that removing trees to add in this area is wasteful?

A. Yes.

Q. *Is it also something that would potentially make you[r] budget for the project higher, removing trees and adding additional fence?*

A. *Sure. Yeah.*

Q. Based on the number of pastures and the tree line that is surrounding the property, do you believe that the site plan is really the best site plan for your proposed use?

A. I believe it is, yes.

Q. And do you believe this is the minimum relief necessary to use the property as you see fit?

A. Yes.

Q. *And I guess ultimately is it—is the tree line, in your opinion, a physical condition that requires this zoning relief?*

A. *Yes.*

N.T. at 18–20; R.R. at 26a–28a (emphasis added). Dellmyer further testified:

Q. *In the event this relief was not granted, would you consider removing trees and putting a parameter [sic] fence closer to the boundary line to get the area you need to exercise horses?*

A. *Absolutely. The land is just the amount of land that we need to make this operation work. If we can't get the relief, we will have to make another use—make it work another way.*

Q. Again, this is—this requested relief is the minimum relief to make that work?

A. Correct.

N.T. at 29–30; R.R. at 37a–38a (emphasis added).

The Township Solicitor also appeared before the ZHB. He explained that Applicant appeared at a meeting before the local governing body prior to the ZHB hearing. At the meeting before the local governing body, Applicant stated that if it obtained the requested dimensional variance, it would limit tree removal to two cuts in the tree line that bisects the subject property as shown on Applicant's site plan. Thus, Applicant sought approval from the local governing body before the ZHB hearing on the requested dimensional variance.

Some objecting landowners also offered testimony before the ZHB. Objector and his wife, who appeared with counsel, own the property located at 1576 Courtney Court in the Township. Objector's property adjoins the subject property; however, it does not border the subject property at an area where Applicant sought a dimensional variance from the required 100–foot setback.

Another nearby landowner, John Lychak, questioned whether Applicant could move the fences further in on the subject property. In response, Dellmyer reiterated that doing so would cause a loss of six-and-a-half acres of usable area. Lychak also questioned Dellmyer regarding Applicant's proposed removal of trees in the tree line that bisects the subject property. Additionally, Lychak expressed concern over the proximity of Applicant's proposal to what he believed was a nearby riparian corridor.

Jonathan Shingles, who owns the adjoining property to the west of the subject property, testified he moved to the area for privacy and space. He is concerned that he will have to look outside and see people riding horses near his property. He is also concerned about the effect the stable will have on birds and wildlife in the area.

Paul Dupont, another nearby landowner, questioned whether Applicant could still

use the subject property for its proposed stables if Applicant did not obtain the requested relief. Dellmyer again explained that denial of the requested dimensional variance would cause Applicant to lose six-and-a-half acres of usable space. Dupont noted Dellmyer's testimony that Applicant would have to cut down trees if it did not obtain the variance. Dupont also asked several questions concerning Applicant's plan to make two cuts in the tree line that bisects the subject property. He questioned whether the tree cuts could be minimized by finding "the least impacted area to go through" to which Applicant's witnesses responded, "Absolutely.... I think we did that." N.T. at 46; R.R. at 54a.

At the conclusion of the hearing, the ZHB voted 3–1 to approve the dimensional variance request subject to three conditions.[3] The ZHB subsequently issued its written decision. In its decision, the ZHB made the following findings.

The subject property, which is an undeveloped parcel that consists of 25 acres, is located in an RA zoning district. If Applicant were required to satisfy the 100–foot setback, it would lose the use of approximately 6 acres of land. Thus, complying with the 100–foot setback would reduce the subject property's usable area by about 25%. The subject property contains a utility easement that partially restricts use of the subject property. If the requested variance were not granted, Applicant would suffer a financial hardship.

No proposed structure would be situated within the required setback. The proposed use is a less intrusive, less intense use than the zoning ordinance would permit, as Applicant is willing to restrict the occupancy to 36 horses.

In its conclusions of law and discussion, the ZHB analyzed the criteria necessary for the grant of a dimensional variance, and it determined Applicant satisfied all of these criteria. Relevant here, the ZHB determined Applicant proved that application of the zoning ordinance's setback provision would result in unnecessary hardship based on the relaxed standard set forth in *Hertzberg v. Zoning Board of Adjustment of City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998). Specifically, denial of the requested dimensional variance would cause Applicant to "forgo use of 25% of the [subject] property for what is otherwise a permitted use" resulting in "an unnecessary economic detriment to Applicant." ZHB Op., 1/14/13, at 9. The ZHB also determined the agreed upon limitation on tree removal would help harmonize the use with the rural residential character of the surrounding area.

Objector appealed to the Court of Common Pleas of Northampton County (trial court), asserting the ZHB abused its discretion and committed errors of law in granting the variance. Objector also asserted Applicant did not prove it was entitled to zoning relief. Applicant and the Township intervened in Objector's appeal to the trial court.

Without taking additional evidence, the trial court affirmed. The trial court issued a thoughtful and thorough opinion in which it upheld the ZHB's determination that

---

**3.** Specifically, the ZHB imposed the following conditions on the grant of the variance: (1) Applicant shall have no more than 36 horses on the subject property at any time; (2) no trees shall be removed for construction of the fence on the subject property except for the two areas referred to as "cuts" as shown on Applicant's Exhibit A–3; and, (3) the placement and installation of the fence, including all earth disturbances required in the installation, shall comply with the Township's requirements pertaining to riparian buffers, including Section 180–95 of the zoning ordinance. The propriety of these conditions is not at issue in this appeal.

Applicant proved the requisite unnecessary hardship to obtain a dimensional variance from the ZHB's setback requirement. Citing Dellmyer's testimony, the trial court determined Applicant established the existence of a mature tree line, which covers the entire outside border of the subject property and also bisects the subject property, as well as an extensive utility easement, are unique features of the subject property that create unnecessary hardship. Absent the grant of the dimensional variance, Applicant would lose the use of approximately 6 acres of its 25–acre property, resulting in about a 25% decrease in usable land. The trial court also rejected Objector's assertions that the record did not support the ZHB's findings. This appeal by Objector followed.

## II. Issues

On appeal,[4] Objector argues the ZHB abused its discretion and erred as a matter of law in granting a variance that allows Applicant to expand certain aspects of its proposed use into portions of the subject property specifically set aside in the zoning ordinance as a perimeter buffer when there was no showing of any legally cognizable hardship, and where the subject property can easily be developed in conformity with the ordinance. Objector also asserts the ZHB erred in making material findings of fact that are not supported by substantial evidence.

## III. Discussion

### A. Unnecessary Hardship

#### 1. Contentions

Objector contends the ZHB erred in determining Applicant proved unnecessary hardship so as to justify the grant of the

variance. Objector maintains that, although Applicant asserted the trees on the subject property constitute a unique physical characteristic causing hardship, Applicant did not show, or even suggest, how the trees are in any way unique to the subject property. Assuming for the sake of the argument that the trees are a unique physical characteristic, there is no evidence that the trees bar development of the subject property in conformity with the zoning ordinance. To the contrary, Objector asserts, the pastures can be located in a manner that conforms with the required buffer setback and doing so has nothing to do with removing trees.

Applicant counters that its evidence of the unique physical characteristic affecting the use of the property, namely, the mature tree line, which limits useable land on the subject property, was sufficient to satisfy its burden of proving hardship under the standard articulated in *Hertzberg*. Applicant contends the permitted use here was granted a dimensional variance to alleviate the hardship to the subject property caused by strict application of the zoning ordinance, which would require cutting a large number of mature trees. Applicant argues this is a proper application of the *Hertzberg* standard and the conclusion as to the existence of unnecessary hardship is consistent with this Court's precedent.

The ZHB echoes Applicant's assertions that the ZHB and the trial court properly determined Applicant satisfied the *Hertzberg* standard, justifying grant of the dimensional variance from the setback requirement. The ZHB argues it properly determined the unique physical features of

4. Because the parties presented no additional evidence after the ZHB's decision, our review is limited to determining whether the ZHB committed an abuse of discretion or an error

of law. *Tri–County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488 (Pa. Cmwlth.), *appeal denied*, —— Pa. ——, 101 A.3d 788 (2014).

the subject property, *i.e.*, the existence of many mature trees, necessitated relief from the setback requirement.

### 2. Analysis

■ A ZHB may grant a variance when the following criteria are met:

(1) an unnecessary hardship will result if the variance is denied, due to the unique physical circumstances or conditions of the property; (2) because of such physical circumstances or conditions the property cannot be developed in strict conformity with the provisions of the zoning ordinance and a variance is necessary to enable the reasonable use of the property; (3) the hardship is not self-inflicted; (4) granting the variance will not alter the essential character of the neighborhood nor be detrimental to the public welfare; and (5) the variance sought is the minimum variance that will afford relief.

*Tri–County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 520 (Pa.Cmwlth.), *appeal denied*, —— Pa. ——, 101 A.3d 788 (2014) (citation omitted).

■ A dimensional variance involves a request to adjust zoning regulations to use the property in a manner consistent with regulations, whereas a use variance involves a request to use property in a manner that is wholly outside zoning regulations. *Hertzberg.* The same criteria apply to use and dimensional variances. *Id.* However, in *Hertzberg*, our Supreme Court set forth a more relaxed standard for establishing unnecessary hardship for a dimensional variance, as opposed to a use variance.

■ Under *Hertzberg*, courts may consider multiple factors in determining whether an applicant established unnecessary hardship for a dimensional variance. These factors include: *"the economic detriment to the applicant if the variance was*

*denied*, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and *the characteristics of the surrounding neighborhood." Id.* at 50 (emphasis added).

Although *Hertzberg* eased the requirements, it did not remove them. *Tri–County.* An applicant must still present evidence as to each of the conditions listed in the zoning ordinance, including unnecessary hardship. *Id.* Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg. Id.*

Nevertheless, as this Court explains: "*Hertzberg* articulated the principle that *unreasonable economic burden may be considered in determining the presence of unnecessary hardship." Society Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment*, 42 A.3d 1178, 1188 (Pa.Cmwlth.2012) (quoting *Yeager v. Zoning Hearing Bd. of City of Allentown*, 779 A.2d 595, 598 (Pa. Cmwlth.2001)) (emphasis added). Further, in *Marshall*, the Supreme Court stated: "This Court has repeatedly made clear that in establishing hardship, an applicant for a variance is *not required* to show that the property at issue is valueless without the variance or that the property cannot be used for any permitted purpose." *Id.* at 330 (emphasis in original).

In its recent decision in *Marshall*, which also involved a zoning board's grant of a variance, our Supreme Court stated: "It is the function of the [ZHB] to determine whether the evidence satisfies the criteria for granting a variance." *Id.* at 331. The Supreme Court also reminded this Court that "[a]n appellate court errs when it

substitutes its judgment on the merits· for that of a zoning board." *Id.* (citation omitted). Thus, in reversing this Court's decision that overturned decisions of a court of common pleas and a local zoning board that · granted an applicant's request for a use variance, the Supreme Court explained:

> While an appellate court might disagree with the [zoning board's] decision, the decision was within the bounds of reason and therefore represented a sound exercise of discretion. The Commonwealth Court's decision indicates no evidence to the contrary. There was no abuse of discretion here. It was error, therefore, for the Commonwealth Court to substitute [its] judgment on the merits for that of the [zoning board]. Doing so was beyond the scope of [the court's] power to review.

*Id.* at 334 (citations and quotations omitted); *see also Noah's Ark Christian Child Care Ctr., Inc. v. Zoning Hearing Bd. of W. Mifflin,* 584 Pa. 9, 880 A.2d 596 (2005) (per curiam) (cautioning this Court to refrain from substituting its judgment for that of the fact-finder in a zoning case). The Court in *Marshall* explained that a zoning board's findings are owed deference, particularly its determination that a variance applicant satisfied the unnecessary hardship criterion. This is particularly so in light of a zoning board's "expertise in and knowledge of local conditions." *Id.* at 333. Additionally, the Court in *Marshall* placed considerable weight on the community support for the applicant's proposal.

Of further note, in *Holmes v. Zoning Hearing Board of Kennett Township,* 39 Pa.Cmwlth. 447, 396 A.2d 859 (1978), this Court upheld a ZHB's grant of a variance from a zoning ordinance's floodplain regulations to allow construction of a "tenant house" where, absent a grant of a variance, the applicants would be required to destroy a "stand of mature pine trees" which stood· "in the only alternative site[.]" *Id.* at 860, 861. We stated:·

> It is argued that the [b]oard abused its discretion in granting the variance *because the fact there was a stand of pine trees in the only· alternative site did not constitute an unnecessary hardship.* The law is clear that a variance may be granted when the ordinance creates an unnecessary hardship which· may be attributable to the unique physical characteristics of the property and when there would not be· an adverse impact on the health, safety or welfare of the general public.... *In the instant case we cannot say that the ·[b]oard, after viewing this ··property, abused its discretion· in holding that the stand of ·mature pine trees was of sufficient value to justify their ·preservation and would preclude construction in that site.*

*Id.* at 861 (emphasis added) (citations omitted).

■ Here, the ZHB determined Applicant satisfied the unnecessary hardship criterion so as to justify the grant of a dimensional variance from the zoning ordinance's setback requirement. In upholding the ZHB's determination that Applicant proved the requisite hardship, the trial court explained (with emphasis added):

> [Objector] ... argues that [Applicant] failed to demonstrate a hardship. In this regard, [Objector] contends that the trees are· not unique to the [subject] [p]roperty and, even if they were unique, the trees do not preclude development of the [subject] [p]roperty in conformity with the [zoning] [o]rdinance. [Objector] believes that the horse pastures could be placed in positions to conform to the setback without removing trees. As discussed below,· we find that [Appli-

cant] presented sufficient evidence of an unnecessary hardship to warrant the [ZHB] granting a variance of the setback requirements. . . .

The [ZHB's] determination that [Applicant] demonstrated an unnecessary hardship to warrant granting the variance request from the 100–foot setback is supported by substantial evidence in the record. In the first instance, [Applicant] established that the existence of a mature tree line, which covers the entirety of the outside border of the [subject] [p]roperty and also bisects the [subject] [p]roperty, is a unique aspect of the [subject] [p]roperty that creates the hardship at issue. As Dellmyer testified, there is an approximately forty-foot tree line around the entire border of the [subject] [p]roperty and another tree line that passes through the middle of the [subject] [p]roperty. *Dellmyer indicated that the tree line acts as a physical hardship to the [subject] [p]roperty because it significantly limits the usable area barring the financial and environmental detriment of significant tree removal.*

*In this regard, Dellmyer provided uncontroverted testimony that placing the combined pasture and perimeter fence at the 100–foot setback would create approximately 6.5 acres of unusable land. In addition, although Dellmyer testified that [Applicant] could install a perimeter fence (and have a 'double fence' with pasture fences located separately within the perimeter fence), he indicated that they would have to encroach upon and remove portions of the mature tree line to attempt to recover some of the usable space lost if [Applicant] could not get the variance. Dellmyer indicated and*

*the [ZHB] determined that the cost of this tree removal to [Applicant] was prohibitive [5] and the combination of the pasture and perimeter fences was the most efficient use of the land and [Applicant's] financial resources. Moreover, as evidenced by the concerns espoused by the Township and the [ZHB] members and the condition imposed on [Applicant] to limit tree removal, the [ZHB] was understandably concerned with [Applicant] possibly having to remove trees from this area.*

[Objector] goes to great lengths to point out that [Applicant] could place its pastures within the required setback without having to cut trees. [Objector] also contends that there was no explanation as to why meeting the required 100–foot setback requires cutting trees. *[Objector], unfortunately, ignores Dellmyer['s] testimony that if [Applicant] could not get the variance, it would have to cut trees to at least place a perimeter fence around the [subject] [p]roperty and to attempt to maximize the possible usable space for pastures that it would lose if the [ZHB] did not approve the variance.* Also, Ms. Mills stated that the number of pastures included in the proposed plan was appropriate to successfully operate the business and maximize the use of the available grass. *Thus, it is not an issue of [Applicant] literally having to remove trees that are located 100 feet from the lot line so they could place pasture fencing; rather, the issue with the trees involves the fact that they cover a significant portion of the [subject] [p]roperty (including a significant section in the middle) and [Applicant] would have to remove some of those trees to create more usable space.*

5. Dellmyer did not use the word "prohibitive" when describing the cost of extensive tree removal. However, our review of his testimony in its entirety reveals that this is a fair inference.

Thus, we find that the [ZHB's] determination that [Applicant] was entitled to a variance because it demonstrated an unnecessary hardship is supported by substantial evidence in the record. ... The [subject] [p]roperty is burdened by the mature tree line significantly encroaching into the borders of the [subject] [p]roperty, the tree line bisecting the [subject] [p]roperty, and the extensive utility easement that further restricts the use of the southeastern portion of the [subject] [p]roperty. The proposed pasture area maximizes the pasture area in a manner to minimize the financial burden and environmental impact of tree removal, it also lessens the intensity of the permitted use by providing more pasture area.

Tr. Ct., Slip Op., 11/25/13, at 9, 13–16 (citations and footnotes omitted).

We discern no error in the trial court's determination that the ZHB properly found Applicant proved unnecessary hardship would result if the variance was denied based on the unique physical conditions of the subject property. Because Applicant seeks a dimensional variance, we may consider multiple factors in determining whether Applicant proved unnecessary hardship, including the economic detriment to Applicant if the variance was denied and the characteristics of the surrounding neighborhood. *Hertzberg.*

Here, Applicant presented unrebutted evidence that a 40–foot mature tree line covers the entire outside border of the subject property and a tree line bisects the subject property, creating a hardship in that it significantly limits the usable area barring significant, costly tree removal, about which the Township and the ZHB expressed concern. The subject property also contains an extensive utility easement, which further restricts its use.

Dellmyer testified the tree line is a physical condition that necessitates zoning relief because it significantly limits the usable area barring the financial and environmental detriment of mature tree removal. N.T. at 18–20, 29–31; R.R. at 26a–28a, 37a–39a. Dellmyer offered uncontroverted testimony that compliance with the 100–foot setback requirement would result in a loss of approximately six-and-a-half acres of usable land. N.T. at 18, 30, 31; R.R. at 26a, 38a, 39a. Additionally, although Dellmyer testified Applicant could install a separate perimeter fence (and have a "double fence" with fenced-in pasture areas located separately within the perimeter fence), he indicated Applicant would have to encroach upon and remove portions of the mature tree line to attempt to recover some of the usable space lost if Applicant could not obtain the variance. N.T. at 18–19, 29–31; R.R. at 26a–27a, 37a–39a.

Dellmyer's unrefuted testimony that Applicant could, as of right, construct a perimeter fence, which would encroach on and require removal of portions of the 40–foot tree line that borders the subject property, is directly supported by the applicable provisions of the zoning ordinance. *See* Sections 180–21, 180–97(C)(2)(a) of the zoning ordinance.

Further, Dellmyer indicated, and the ZHB determined, the cost of tree removal was financially burdensome and the proposed combination of the pasture and perimeter fences was the most efficient use of the subject property. N.T. at 19, 20; R.R. at 27a–28a. Moreover, as evidenced by the concerns expressed by the Township and the ZHB, and the condition imposed on Applicant to limit tree removal, the ZHB was understandably concerned with Applicant having to remove trees. The ZHB stated the limited tree removal occasioned by Applicant's proposal kept

the proposed use "more in line with the rural residential character of the neighborhood." ZHB Op. at 10. In sum, the trial court correctly upheld the ZHB's determination that Applicant proved the requisite unnecessary hardship to justify the grant of a dimensional variance. Further, as the trial court observed, the record reveals the proposed pasture area maximizes the pasture area in a manner that minimizes the impacts of tree removal, and lessens the intensity of the permitted use by providing more usable pasture area.

Additionally, similar to *Marshall*, the record reveals community support for Applicant's proposal. To that end, the Township Solicitor, who appeared before the ZHB, explained that Applicant appeared at a meeting before the local governing body prior to the ZHB hearing. At that meeting, Applicant stated that if it obtained the requested dimensional variance, it would limit tree removal to two areas in the tree line that bisects the subject property as shown on Applicant's site plan. N.T. at 20; R.R. at 28a. Thus, Applicant sought out and ultimately obtained local governing body approval for its proposal on the condition that it not undertake substantial tree removal as it plans to do if the ZHB denied the variance. N.T. at 29–30; R.R. at 37a–38a.[6]

### B. ZHB's Findings

#### 1. Contentions

Objector also argues the ZHB's Findings of Fact Nos. 4, 5 and 7 are not supported by substantial evidence. He asserts that, when read together, these findings summarize the impact of the zoning ordinance's buffering requirements on Applicant's proposed use, but this is not the equivalent of articulating hardship. *See, e.g., Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144 (Pa.Cmwlth.2011) (to establish unnecessary hardship for dimensional variance, applicant must prove something more than mere desire to develop property as it wishes or that it will be financially burdened if variance is not granted). In any event, Objector contends the ZHB's findings contradict the record and overstate the impact of the buffering requirements on the subject property.

Objector argues, in granting a variance from the 100–foot perimeter buffer yard requirement for horse pastures, the ZHB found that if the variance were not granted Applicant would: (i) lose the use of 6 acres of land; (ii) suffer a reduction in useable land area of 25%; and, (iii) suffer a financial hardship. *See* ZHB Op., Finding of Fact (F.F.) Nos. 4, 5, 7. Objector asserts this is partly true. Application of the 100–foot buffer yard places certain acreage off limits for horse pastures. That is what is intended. However, this acreage is not lost, it is just not available for horse pastures. Objector maintains the ZHB abused its discretion and erred as a matter of law in concluding the intended consequences of the buffer requirements impose unnecessary hardship.

Applicant responds that, as the trial court properly determined, the challenged ZHB findings are adequately supported. It contends the unrebutted testimony of its witnesses, which the ZHB found credible, establishes that (i) the cost of tree removal to build a permitted, perimeter fence was prohibitive; (ii) combining the pasture and perimeter fences was the most efficient

---

6. In addition, as the trial court noted, Objector only challenged the ZHB's determination that Applicant satisfied the unnecessary hardship criterion before the trial court. *See* Tr. Ct., Slip Op., at 9 n. 9. Thus, we need not address whether the ZHB properly determined that Applicant satisfied the remaining criteria for the grant of the dimensional variance.

use of land and financial resources; (iii) placing the combined pasture and perimeter fence at the 100–foot setback would create approximately 6.5 acres of unusable land; and, (iv) the existing mature tree line creates a natural buffer between the subject property and neighboring properties. Moreover, the Township appeared as a party in favor of Applicant's plan so long as certain conditions were included in the relief granted that would limit the number of trees disturbed on the subject property. Applicant agreed to this condition.

Similarly, the ZHB [7] asserts the challenged findings are amply supported. It argues Findings of Fact Nos. 4 and 5 are supported by Dellmyer's testimony, and Finding of Fact No. 7 is supported by Ms. Mills' testimony.

## 2. Analysis

■ This Court may not substitute its interpretation of the evidence for that of the ZHB. *Marshall; Tri–County.* It is the ZHB's function to weigh the evidence before it. *Tri–County.* The ZHB is the sole judge of the credibility of witnesses and the weight afforded their testimony. *Marshall; Tri–County.* We must view the evidence in a light most favorable to the prevailing party, who must be given the benefit of all reasonable inferences arising from the evidence. *In re McGlynn,* 974 A.2d 525 (Pa.Cmwlth.2009).

Here, Objector challenges the following ZHB findings:

4. If Applicant were required to meet the 100′ setback, it would lose the use of approximately 6 acres of land.

5. Meeting the 100′ setback would reduce the usable area by about 25%.

\*　　\*　　\*

7. The Township joins in the ZHB's brief.

7. If the variance were not granted, Applicant would suffer a financial hardship.

F.F. Nos. 4, 5, 7.

■ As to Findings of Fact Nos. 4 and 5, Objector asserts these findings are "not true" because Applicant retains all rights to use the pasture buffer areas, just not for pastures. Br. for Appellant at 10. Specifically, Objector argues the setback requirement in Section 180–103(B)(2) of the zoning ordinance applies to stables and pasture areas, but does not apply to riding trails, single-family dwellings, barns and storage building or parking areas, all of which appear on Applicant's site plan. Objector maintains nothing in the record supports the ZHB's findings that if Applicant were required to meet the 100–foot setback requirement that Applicant would lose approximately 6 acres (or about 25%) of its usable land.

Contrary to Objector's assertions, Findings of Fact Nos. 4 and 5 are directly supported by Dellmyer's repeated testimony that if Applicant were required to comply with the 100–foot pasture setback requirement, it would lose a usable area of approximately six-and-a-half acres of land (or more than 25% of its total 25–acre property). N.T. at 18, 30, 31; R.R. at 26a, 38a, 39a. Dellmyer's testimony was not challenged or contested before the ZHB. Further, while Objector asserts Applicant could locate other uses within the 100–foot setback area, as the ZHB found, Applicant proposes to use the subject property primarily for pastureland, a permitted use in the RA district. ZHB Op., Concl. of Law No. 1. Our review of Applicant's site plan reveals that Applicant was limited in the location of the pastures by the 40–foot tree line that borders the subject property, the tree line that essentially bisects the sub-

ject property and an extensive utility easement in the southeastern portion of the property. R.R. at 63a. Therefore, Findings of Fact Nos. 4 and 5 are amply supported by the record.

■ As to Finding of Fact No. 7, Objector challenges this finding on the ground that the only hardship Applicant would suffer would be escaping the costs associated with compliance with the setback requirement. He also asserts Applicant's witness conceded the number of pastures Applicant proposes exceeds the number of pastures needed to operate the riding stable business.

Contrary to Objector's assertions, Dellmyer testified, and the ZHB agreed, if Applicant had to remove a significant number of trees to create more usable land and erect a perimeter fence, it would be inefficient and wasteful. N.T. at 19; R.R. at 27a. Dellmyer also testified that such tree removal would increase costs associated with Applicant's proposal. *Id.* Further, based on Dellmyer's testimony, the ZHB determined that, because Applicant will primarily use the subject property for pastureland, forgoing the use of approximately 25% of the land for an otherwise permitted use would cause unnecessary economic detriment to Applicant. ZHB Op., Concl. of Law No. 6.

In addition, as to Objector's claim that Ms. Mills conceded the number of pastures Applicant proposes exceeds the number of pastures needed to operate the business, Ms. Mills actually testified as follows:

Q. Is this the minimum—the number of the pastures on the site plan, is this the minimum number of pastures that you would need to successfully operate Lucky Shoe Farm?

A. No. I think you can find in the past I have worked at areas with far less pastures and more horses.

Q. Maybe I will rephrase the question. *Is this the—is this number of pastures appropriate to operate the farm successfully?*

A. *Correct. Yes.*

Q. And is the number of pastures in the business model you are seeking with a limited number of horses per pasture to maximize grass remain [sic] at the property?

A. Absolutely, yes.

N.T. at 15–16; R.R. at 23a–24a (emphasis added).

Thus, although Objector accurately sets forth Ms. Mills' *initial* response to a question by her counsel, Objector ignores counsel's follow-up questions and Ms. Mills' responses. As excerpted above, although Ms. Mills initially stated the number of pastures was not necessary to successfully operate Lucky Shoe Farm, she clarified this response by stating the number of pastures proposed was appropriate for the farm to operate successfully. As a result, we reject Objector's assertion that Ms. Mills' initial statement in response to her counsel's question compels a conclusion that Finding of Fact No. 7 lacks record support.[8]

---

8. Objector also challenges Finding of Fact No. 8, which states: "No proposed structure will be within the required setback." ZHB Op., 1/14/13, Finding of Fact No. 8. He asserts this finding is not supported by substantial evidence because a fence is a "structure" as defined by the zoning ordinance, and Applicant is obviously placing a fence within the required setback.

Regardless of the asserted flaw in the wording of Finding of Fact No. 8, because this finding is unnecessary to support the ZHB's critical determinations regarding Applicant's entitlement to the dimensional variance, the asserted error does not compel reversal of the ZHB's decision.

For all the foregoing reasons, we affirm the order of the trial court, which upheld the ZHB's grant of Applicant's dimensional variance request.

## ORDER

**AND NOW,** this 29th day of May, 2015, the order of the Court of Common Pleas of Northampton County is **AFFIRMED.**

## DISSENTING OPINION BY Judge BONNIE BRIGANCE LEADBETTER.

The land at issue in this case is an undeveloped 24.6 acre property, which the owners propose to develop as a facility for boarding and training horses and for riding lessons, a permitted use in the zoning district. Because I see no unnecessary hardship attendant to requiring the owners to adhere to the 100 foot setback required for pastures, I must respectfully dissent.

Although Mr. Dellmyer[1] answered "yes" to the following question by his attorney, "is the tree line, in your opinion, a physical condition that requires this zoning relief?" the evidence does not support this conclusion.[2] Neither Dellmyer nor Ms. Mills testified that it would be necessary to cut down trees in order to comply with the ordinance, and the ZHB did not so find. Indeed, the evidence reflects that the plan was to place the pasture fences near the *inside* edge of the tree line; compliance with the mandated setback would require moving the pasture fences further toward the center of the property, further *away* from the trees. Rather, the property owners desired the variance because moving the fences further inside the property would cause a loss of approximately six acres of pasture land. Dellmyer testified that he would consider cutting down the trees if the variance were denied in order to create an area outside the pasture fences where the horses could be exercised, thus increasing the usable acreage, something that could be done as of right under the ordinance.[3]

Nonetheless, the evidence does not reflect that the proposed use would not be viable with such reduced pasture land without disturbing the existing trees. Under Section 180–103(B)(1) of the zoning ordinance, a riding stable must have a minimum lot size of three acres plus a half acre for each additional horse over six. Section 180–103(B)(2) of the zoning ordinance specifically prohibits the pasturing of horses within 100 feet of property lines not bordering a road. Under the zoning ordinance, Lucky Shoe Farms could stable up to 50 horses, significantly more than currently intended under the proposed business model. There is no evidence of record demonstrating that it would be unable to operate a riding stable on the property, only testimony that it would be unable to operate the stable under its preferred plan. As the majority notes, Ms. Mills testified that she previously worked at areas with "far less pastures and more horses," but the 14 pastures proposed is the appropriate number of pastures to op-

---

1. As the majority opinion explains, Dellmyer and Kathryn Mills intend to operate Lucky Shoe Farms (owned by Kathryn) on the land which is owned by Green Gables Investment Partners, LP, and entity owned by Kathryn's mother, Kathleen Mills.

2. ZHB Hearing, Notes of Testimony at 20.

3. Dellmyer testified that he would consider cutting down the trees if the variance was denied in order to create an area outside the pasture fences where the horses could be exercised, thus increasing the usable acreage, something that could be done as of right under the ordinance. In my judgment, this was a less than subtle attempt to force the ZHB to the Hobson's Choice of allowing the variance or having the trees removed.

erate the farm successfully under their business model, in which the farm would have a limited number of horses per pasture to maximize the grass remaining at the property. ZHB Hearing, Notes of Testimony (N.T.) at 15–16. In other words, as Dellmyer testified, the variance represented "the minimum relief necessary to use the property *as [Mills and Dellmyer] see fit.*" *Id.*, N.T. at 19 (emphasis added).

In order to establish unnecessary hardship entitling a property owner to a dimensional variance, an applicant must prove something more than a mere desire to develop a property as he wishes or that he will be financially burdened if the variance is not granted. *Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144, 149 (Pa. Cmwlth.2011). "A substantial burden must attend *all* dimensionally compliant uses of the property, not just the particular use the owner chooses." *Yeager v. Zoning Hearing Bd. of the City of Allentown*, 779 A.2d 595, 598 (Pa.Cmwlth.2001) (emphasis in original) (dimensional variance denied where property was being used as car dealership, but dimensional requirements of ordinance prevented owner from complying with corporate brand requirements for a Land Rover dealership).

The majority correctly notes that our Supreme Court has recently admonished this Court to accord substantial deference to the ZHB's determination in these matters. *Marshall v. City of Philadelphia*, 626 Pa. 385, 97 A.3d 323, 333–34 (2014). However, when the issue, as here, is a question of law, our review is plenary, and the holding in *Marshall* certainly does not require that we rubber stamp whatever the ZHB finds to be a desirable use of the property. Rather, *Marshall* reiterated the Court's holding in *O'Neill v. Philadelphia*

*Zoning Board of Adjustment*, 384 Pa. 379, 120 A.2d 901 (1956), that:

a zoning board's discretion is "not so circumscribed as to require a property owner to reconstruct a building to a conforming use regardless of the financial burden that would be incident thereto[, e]specially ... where the change sought is from one nonconforming use to another more desirable nonconforming use that will not adversely affect but better the neighborhood."

*Marshall*, 97 A.3d at 333 (quoting *O'Neill*, 120 A.2d at 904). The circumstances in *Marshall* were a far cry from those presented here. There, "the structure at issue was a century-old, legally non-conforming school building, which not only was already vacant but also was already in need of repair ... [and] could be conformed for a permitted use only at a prohibitive expense." *Marshall*, 97 A.3d at 332.

Here, in contrast, we are dealing with 24 acres of undeveloped land. There is no evidence that the property owners are unable to operate a riding stable on the property in accordance with the ordinance, let alone that the setback requirement for horse pastures imposes a substantial burden on *all permitted uses* of the property. The Board found that the proposal represented a reasonable use of the land and, essentially, that the agreement to reduce the number of pastured horses substantially below that allowed by the ordinance (and presumably also, the agreement not to cut down the perimeter trees) provided a greater benefit than the negative impact of a fairly modest variance from the required setback. I do not disagree. Unfortunately, the standard to obtain a variance is high, because if a zoning board grants unnecessary variances to promote what it believes is a beneficial use of the land, it is usurping the policy-making legislative

power of the governing board which enacted the ordinance at issue. That standard simply was not met in this case.

For the foregoing reasons, I would reverse.

President Judge DAN PELLEGRINI and Judge P. KEVIN BROBSON join in this dissenting opinion.