# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Norristown Area       :
School District from the Decision       :
Dated September 23, 2020 of the        :
Municipality of Norristown Zoning      :
Hearing Board                          :
                                       :   No. 614 C.D. 2021
Appeal of: Norristown Area             :   Submitted: June 24, 2022
School District                        :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE MARY HANNAH LEAVITT, Senior Judge


**OPINION NOT REPORTED**


MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED:      August 28, 2023

Norristown Area School District (District) appeals from the May 4, 2021 Order of the Court of Common Pleas of Montgomery County (common pleas) that denied District's appeal and affirmed the decision of the Municipality of Norristown (Norristown) Zoning Hearing Board (Board) denying District's application for a special exception seeking to change a preexisting, nonconforming use to another nonconforming use (Application). District argues common pleas erred because District met its burden of proof under Section 320-291.A.3.(a).[3] of the BOROUGH OF NORRISTOWN ZONING CODE (2016) (Code) and precedent and the Board's interpretation of those provisions and the law was unduly narrow and improperly based on extrinsic matters. Upon review, we affirm.

## I. BACKGROUND

District owns property that is zoned R-2 Residential (Property), upon which is located the Roosevelt School for ninth through twelfth grades (School), an adjacent parking lot, and Roosevelt Field (Field), District's former athletic field. (Board Findings of Fact (FOF) ¶¶ 12, 34; Conclusions of Law (COL) ¶ 7.[1])  Both the School and the Field are preexisting, nonconforming uses.  (FOF ¶ 13.)  District filed the Application in August 2020 seeking a special exception to alter its nonconforming use of the Field by allowing District to lease the Field to First Student, Inc. (First Student), a private company to which District had outsourced its transportation services, to park up to 83 vans.  (*Id.* ¶¶ 14, 17, 29, 30-32; COL ¶ 7.)  First Student also would place a temporary trailer at the site to serve as an office at which the vans' drivers would check in and pick up/drop off keys.  (Reproduced Record (R.R.) at 25a.)

Section 320-291.A.3.(a).[3] of the Code authorizes the change of one preexisting, nonconforming use to another nonconforming use as a special exception so long as certain conditions are met.  That section provides:

(a) Changes.

. . . .

[3] A nonconforming use may be changed to another nonconforming use only if permitted by special exception granted by the . . . Board in accordance with Article XXI, Special Exceptions, and after the following conditions are met:

[a] The applicant shall show that the nonconforming use cannot reasonably be changed to a conforming use.

---

[1] The Board's decision is found at pages 79a-92a of the Reproduced Record.

2

[b] The applicant shall show that the proposed change will be equally or less objectionable in external effects than the existing nonconforming use with regard to:

[i] Traffic generation and congestion, including truck, passenger car, bicycle and pedestrian traffic.

[ii] Noise, smoke, dust, fumes, vapors, gases, heat, odor, glare or vibration.

[iii] Storage and waste disposal.

[iv] Appearance.

Code, § 320-291.A.3.(a).[3].[2]

The Board held a virtual public hearing on the Application beginning at 12:36 a.m. on September 22, 2020, and concluding at 1:10 a.m. (R.R. at 29a, 63a; FOF ¶ 40.) Before beginning the hearing, the Board asked District if it would agree to continue the matter due to the time, and District would not agree. (FOF ¶ 40.) District introduced the evidence of its expert, Christopher Fazio, PE, CME (Engineer), and Robert Malkowski, its Director of Operations (Director), as well as photographs of the Property and the surrounding area. One resident participated in the hearing; others had been waiting to participate but, due to the lateness of the proceeding, disconnected from the virtual hearing before it began. (*Id.*; COL ¶ 19.)

Engineer testified as follows about the proposed use and the Code's requirements for obtaining a special exception, which he indicated, generally, were met by the Application. Changes would be made to the grassy field to accommodate the storage of a maximum of 83 vans, but these changes would not be permanent or affect water runoff. (FOF ¶¶ 16-17, 20; COL ¶ 8.) No buses would be permitted to be parked on the Field, nor would any maintenance or fueling of the vans be allowed

---

[2] This section is found at pages 94a-95a of the Reproduced Record.

there. (FOF ¶¶ 18-19; COL ¶ 9.) The traffic impact would be minor, and if the guidelines developed by the Pennsylvania Department of Transportation (DOT) for its projects were used, the proposed use would not require a formal traffic study. (FOF ¶¶ 21-22; COL ¶ 12.) First Student drivers would arrive at the Field in their personal vehicles in the morning, swap those vehicles with a van, leave the Field to perform their student runs, return to the Field, and leave in their personal vehicles. (FOF ¶¶ 21, 37; R.R. at 56a.) They would repeat the same pattern in the afternoon. (FOF ¶ 37; COL ¶ 13.) This would result in an additional 664 vehicle trips every school day, which Engineer described as "miniscule." (FOF ¶¶ 21-22; COL ¶ 12.) All traffic would access the Field through the adjacent parking lot and "via Sterigere Street[,] which then connects with Markley Street," an arterial roadway that had been recently improved and had a daily traffic load of 20,420 vehicles, making the proposed increase of 664 trips "not a significant increase in traffic." (FOF ¶ 23; COL ¶¶ 13-14.) Engineer noted that the

> previous use for [the] Field was rather intense when it was fully functioning. There were a lot of vehicles, and a lot of traffic going into and out of that area. Now that that's been removed, the additional 664 travel movements per day really will not increase traffic dramatically to that area at all.

(R.R. at 42a.) He agreed that the traffic generation and congestion would be significantly less than the prior use. (*Id.* at 43a.) Although Engineer offered testimony regarding the effects of the increased traffic on Markley Street, he provided no specific testimony as to the surrounding neighborhood not on Markley Street, which is where the Field is located, including Sterigere Street, which is a small residential street. (COL ¶ 22.)

As for the remaining Code requirements, Engineer testified as follows.

4

Q. . . . . So do you have an opinion on whether [the] Field can be used for a conforming use in the R-2 or not?

A. I think what the . . . [D]istrict is proposing is permissible, based on how the . . . [C]ode is written, and based on the release that can require.

. . . .

Q. . . . [T]he noise, smoke, dust, fumes, vapors, gases, heat, odor, vibration will be less?

A. Yes, it will.

Q. The storage and waste disposal will be less?

A. Absolutely, it will be.

Q. And issues with appearance will be less?

A. Correct.

Q. Because the vehicles actually park behind the stadium walls, correct?

A. That is correct.

Q. So they won't be on the street? You won't see them on the screen [sic]?

A. No, they will all be contained on the site itself.

(R.R. at 42a-43a; *see* FOF ¶¶ 25-28.) Engineer provided no additional detail as to these requirements.

Director testified as follows. The vans would be used to transport District students to primarily non-public schools. (FOF ¶¶ 29, 31; COL ¶ 10.) District expected the lease with First Student to result in a financial benefit to District, as it should result in reducing District's costs. (FOF ¶ 35.) The surface being placed on the Field could be removed, and the Field returned to its prior condition. (*Id.* ¶ 36;

COL ¶ 18.)  District had no current plans for the long-term use of the Field, and the proposed use was temporary in nature.  (FOF ¶ 39.)  At the time of the hearing, no First Student vans were parked on the Field.  (*Id.* ¶ 42.)  District had no direct communication with the neighboring property owners about the proposed change in use.  (*Id.* ¶ 43; COL ¶ 23.)  Director characterized the change as being "adjacent to a current parking lot that's already been used to park vehicles" so District "consider[ed] it an addition to what's already there."  (R.R. at 60a.)

At the end of the hearing, it was noted on the record that there had been neighboring property owners that attended the proceedings earlier, but had left because they did not know if the Board was going to reach the Application.  (*Id.* at 57a.)  A Board member asked whether there was an issue due to there being people who wanted to comment, but logged off due to the time, and whether the matter should be continued so that those people could comment.  (*Id.* at 58a, 60a.)  District's counsel responded District was "interested in moving forward with this" as there was "an important financial benefit to [] [D]istrict."  (*Id.* at 59a.)  Ultimately, because none of the neighbors had specifically asked to continue the matter, the Board proceeded and voted 3-2 to deny the Application.  (*Id.* at 61a-63a.)

In its written decision, the Board cited the provisions of Section 320-291.A.3.(a).[3] and concluded:

> 21.  The [] [P]roperty[] is a legal non[]conforming use [and] is located in the R-2, Residential Zoning District in the Municipality.  [Code] Section 320-40, Legislative Intent, specifically states "that the standards contained herein are intended to protect the public's health, safety and general welfare by mitigating the adverse impact of overcrowding on a dense urban landscape.  Such negative impacts include, but are not limited to, loss of urban green space, reduced residential on-street parking, and an infringement on personal privacy."

6

In the instant matter, [District] offered the testimony of [Engineer] that the amount of traffic generation and congestion will be equal or less objectionable than previous uses. Further, [District] expects the noise, smoke, dust, fumes, vapors, gases, heat, odor, [and] vibration will be less than previous uses. Last, [District] expects storage and waste disposal to be less. However, [District] did not comment on the additional . . . 83[] vehicles that did not exist previously on the [] [P]roperty. When these vehicles are not in use they will be stored [on] the [P]roperty overnight and in between the above-referenced daily trips. This is the storage of an additional . . . 83[] vehicles that did not exist for the majority of the day. Additionally, these would be an additional . . . 83[] individuals, the drivers, entering the neighborhood, that would not otherwise be there.

22. [District] made no effort to contact the neighbors of the community regarding this proposal. Despite the fact that the vans will be parked on the [] Field, they need to enter and exit the property at least . . . 4[] times each day. Further, the driver of each van needs to enter and exit the [P]roperty . . . 4[] times each day, which is the . . . 664[] trips per day noted by [District]'s expert. This is an additional . . . 83[] vehicles in the neighborhood[;] therefore, it can easily be expected that this will increase the noise, smoke, dust, fumes, vapor, gases and odor from any previous uses since there were never . . . 83[] vans parked on the [] [F]ield in the past. While this increase in traffic is not significant in comparison to Markley Street[,] it does appear to be significant with regard to the surrounding neighborhood that is not located on Markley Street, which is where the [] [F]ield is located.

23. Therefore, in consideration of the health, welfare and safety of the neighborhood[,] the Board has determined that the change of the nonconforming use is detrimental to the neighborhood and surrounding community.

(COL ¶¶ 21-23.)

District appealed to common pleas, arguing it met its burden of proving the Code's objective standards and the Board erred by finding otherwise, and the Board erred in relying on District's alleged failure to take extra-legal steps to contact neighboring property owners. Common pleas, without taking evidence, affirmed. District appealed to this Court.

7

## II.    DISCUSSION

Where common pleas "takes no additional evidence in a land use appeal, our scope of review is limited to determining whether the zoning hearing board committed an error of law or abused its discretion." *EDF Renewable Energy v. Foster Twp. Zoning Hearing Bd.*, 150 A.3d 538, 544 n.4 (Pa. Cmwlth. 2016). "A zoning hearing board abuses its discretion when its findings are not supported by substantial evidence." *Id.* "Substantial evidence means relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* The zoning hearing board is the sole judge of witness credibility and evidentiary weight, and "[t]his Court may not substitute its interpretation of the evidence for that of the [zoning hearing board]." *Tidd v. Lower Saucon Twp. Zoning Hearing Bd.*, 118 A.3d 1, 13 (Pa. Cmwlth. 2015). Further, this Court must view the evidence presented in the light most favorable to the party that prevailed, including by giving that party the benefit of all reasonable inferences arising therefrom. *Id.*

This Court has described special exceptions, and the related burdens of proof for obtaining or objecting to a special exception as follows.

> A special exception is not an exception to a zoning ordinance, but rather a use, which is expressly permitted, absent a showing of a detrimental effect on the community. . . . **The applicant for the proposed use has both the duty to present evidence and the burden of persuading the board that the proposed use satisfies the objective requirements of the ordinance for the grant of a special exception**. **Once the applicant meets these burdens**, a presumption arises that the use is consistent with the health, safety and general welfare of the community. **The burden then normally shifts to the objectors** of the application to present evidence and persuade the Board that the proposed use will have a generally detrimental effect. . . . The evidence presented by objectors must show a high probability that the use will generate adverse impacts not normally generated by this type of use and that these impacts will pose a substantial threat to the health and safety of the community.

8

*Greaton Props. v. Lower Merion Township*, 796 A.2d 1038, 1045-46 (Pa. Cmwlth. 2002) (citations omitted, emphasis added). Thus, if the applicant does not meet its burden of proving and persuading a zoning hearing board that it meets all of the objective requirements, the burden does not shift to objectors to present evidence in opposition to the special exception.

District argues the Board narrowly interpreted the law relating to the expansion of a preexisting, nonconforming use because the Board was required to apply the broadest interpretation of the Code so that District could benefit from the least restrictive use of the Property. (District's Brief (Br.) at 13 (citing *Borough of Fleetwood v. Zoning Hearing Bd. of Borough of Fleetwood*, 649 A.2d 651 (Pa. 1994)).) Citing Engineer's testimony, District maintains the uncontroverted evidence met all of Section 320-291.A.3.(a).[3]'s objective requirements and it was error to conclude that District did not do so. Having met the objective requirements, and there being no testimony or evidence introduced opposing the Application or indicating that the grant of the special exception would "substantially affect the public health, safety and welfare of the community," District argues the Board was required to grant the Application. (District's Br. at 17-18 (citing *Monroe Land Invs. v. Zoning Bd. of Adjustment*, 182 A.3d 1 (Pa. Cmwlth. 2018)).) The Board and Norristown (Appellees) respond there was no error in the Application's denial because District failed to satisfy each of the Code's objective requirements, including that the traffic generation/congestion and storage relating to the new use would be equal to or less than the existing use.

In its Opinion issued pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(a), (1925(a) Op.), common pleas concluded that the Board committed no error in denying the Application for numerous reasons,

9

including because District failed to meet its burden of proof as to the requirements for traffic and congestion, environmental impact, and storage. Specifically, common pleas explained:

> [District] had the burden of proving that the proposed change would be equally or less objectionable in external effects than the existing nonconforming use. However, upon review of the transcript, the exhibits, and the Board's [decision], [District] clearly did not meet [its] burden.
>
> First, with regard to traffic, [District] failed to consider the impact of traffic on Sterigere Street. All of [District]'s traffic impact analysis was limited to that of Markley Street.[] In [its] analysis [District] determined that [the] maximum number of trips to and from the [F]ield through Markley Street would consist of 664 trips.[] By way of comparison, [District] acknowledged that Markley Street carries an average daily traffic load of 20,420 vehicles per day – thus, concluding that an addition[al] 664 would have minimal impact.[]
>
> However, [District] did not include the same analysis for Sterigere Street, despite acknowledging that all traffic to and from the [F]ield would have to exit via Sterigere Street to get to the more heavily traveled Markley Street.[] Sterigere Street, by comparison to Markley Street, is largely residential and an additional . . . 83[] vans would have a substantial impact for a relatively small neighborhood street. As argued by the Board before [common pleas], adding an additional 664 trips to a small neighborhood street would provide for a significant change to the residents who live on that street. Even without the proper traffic study (which [District] failed to do[3]), by examining [District]'s submissions of pictures of the relatively small surrounding neighborhood street, it is clear that traffic generation and congestion would be greatly increased.
>
> Second, [District] minimized the environmental impacts, including noise, smoke[,] dust, fumes, etc., without providing specific evidence

---

[3] Although District argues that DOT would not require a traffic study if this matter was being considered by **DOT**, Section 320-291.A.3(a).[3].[b].[i] specifically requires a consideration of traffic and congestion of both the prior nonconforming use and the proposed nonconforming use. Code, § 320-291.A.3.(a).[3].[b].[i]. Thus, a study, or at least some testimony regarding the impact on Sterigere Street, was needed to meet this requirement.

to justify the same. In fact, [District] only elicited one (1) question with regard to environmental impact.[ (R.R. at 43a.)] In the Board's [decision], the Board noted that by default, a total of 166 new vehicles (83 vans plus the 83 personal vehicles of the drivers) for a relatively small neighborhood would be objectionable as the vehicles do not exist in the [F]ield's current use. Again, [District] did not introduce any evidence, including any environmental impact studies, to verify [its] claim of minimal impact to the surrounding neighborhood.

Third, in regard to storage and waste disposal [District] once again provided minimal testimony and evidence on the issue. [Engineer] simply stated that there would be "less" storage and waste disposal with the addition of 166 more vehicles to the area.[ (R.R. at 43a.)] While [District] indicated that no maintenance would be performed on the vehicles on the [F]ield, the Board found that at any time of the day, there will be at least . . . 83[] vehicles parked on a field that were not there before.[] Thus, the Board concluded that the storage of . . . 83[] vehicles, and waste thereof, would at a minimum be increased on the [F]ield as there previously was never storage of any vehicles . . . before on any kind of athletic field.[]

(1925(a) Op. at 12-14.) Upon our review of the record and the Board's decision, we agree with the thoughtful analysis of Judge Daniel J. Clifford in common pleas' 1925(a) Opinion. District bore the burden of proving all of Section 320-291.A.3.(a).[3]'s requirements, and having not done so, there was no error in the Board's denying District a special exception. *Greaton Props.*, 796 A.2d at 1045-46.

District also argues the Board erred in finding that granting the special exception would be detrimental to the neighborhood and surrounding community because there were no objectors that submitted evidence to establish such detriment. While the Board stated, "the change of the nonconforming use is detrimental to the neighborhood and surrounding community," (COL ¶ 23), it is apparent from the Board's decision taken as a whole that it found that District failed to establish the above-discussed objective requirements of Section 320-291.A.3.(a).[3], which precludes the grant of the special exception without the burden ever shifting to an

11

objecting party. Additionally, to the extent District maintains the Board was required to grant the Application because its evidence was "uncontroverted," the Board, acting as factfinder, is entitled to accept or reject uncontradicted evidence, even that offered by an expert, if found not to be credible. *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 811 (Pa. Cmwlth. 2005). The Board's conclusion reflects that the Board did not credit Engineer's testimony that traffic and congestion, environmental impact, and storage would be "less" with the new proposed use. It was within the Board's authority to do so. *Id.*

Finally, District argues the Board erred in relying on extrinsic matters, the District's failure to contact or communicate with the neighboring property owners, to deny the Application. District asserts no such communication or contact is required by Section 908 of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S. § 10908.[4] Appellees respond nothing in the record shows the "Board relied

---

[4] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10908. This section governs hearings before zoning hearing boards and provides, in pertinent part:

> The board shall conduct hearings and make decisions in accordance with the following requirements:
>
> (1) Public notice shall be given and written notice shall be given to the applicant, the zoning officer, such other persons as the governing body shall designate by ordinance and to any person who has made timely request for the same. Written notices shall be given at such time and in such manner as shall be prescribed by ordinance or, in the absence of ordinance provision, by rules of the board. In addition to the written notice provided herein, written notice of said hearing shall be conspicuously posted on the affected tract of land at least one week prior to the hearing.
>
> . . . .
>
> (1.2) . . . An applicant may, upon request, be granted additional hearings to complete his case-in-chief provided the persons opposed to the application are

**(Footnote continued on next page…)**

12

solely on the failure of [] District to speak or permit comments of the neighbors."
(Appellees' Br. at 29.) Rather, Appellees argue, the Board relied on District's failure
to meet the Code's objective requirements.

In its 1925(a) Opinion, common pleas explained that the Board committed no
reversible error in this regard.

> When an Ordinance lists certain criteria to be met, the applicant bears
> the burden of establishing that the specific criteria are satisfied in order
> to grant the special exception.[] Only once the applicant establishes
> compliance with [the] specific criteria, [does] the burden [] shift[] to
> the objectors to prove "to a high degree of probability that the impact
> from the proposed use will substantially affect the health, safety, and
> welfare of the community . . . ."[]
>
> It must be first noted that the Board's [decision] did not solely base its
> [denial] on the lack of neighboring input.[] The majority of the Board's
> decision rested on [District]'s failure to meet the standards and
> requirements outlined in the [Code]. Secondarily, [District] did not
> reach out, or allow for a continuance for, additional public comment to
> determine how the surrounding neighborhood felt about the proposed
> expansion – which could have further evidenced the negative
> consequences of the proposed special exception. However, while
> [District] is correct that the [Code] does not "require" that [it]
> affirmatively elicit comments from neighboring residents, the [Code]
> **does** require that [it] establish that specific criteria would be less
> objectionable (emphasis added).
>
> . . . . [P]ursuant to *Bray* [*v. Zoning Board of Adjustment*, 410 A.2d 909,
> 912-13 (Pa. Cmwlth. 1980),] and *Heisler*[*'s Egg Farm, Inc. v. Walker
> Township Zoning Hearing Board*, 232 A.3d 1024, 1036 (Pa. Cmwlth.
> 2020)], the burden was never shifted to any possible objectors because

granted an equal number of additional hearings. Persons opposed to the application
may, upon the written consent or consent on the record by the applicant and
municipality, be granted additional hearings to complete their opposition to the
application provided the applicant is granted an equal number of additional hearings
for rebuttal.

53 P.S. § 10908(1), (1.2).

[District] failed to meet [its] initial burden. Thus, [District]'s issue is misplaced, as with or without public comment, [District] was unable to prove that traffic, storage and waste disposal, [and] environmental/health concerns . . . would be less objectionable than the [P]roperty's current use.

Thus, notwithstanding the lack of neighboring resident input, the proposal still did not meet [the] specific requirements outlined in the [Code] for granting the specific exception. . . . Accordingly, the Board did not abuse its discretion in [] denying [District]'s Application.

(1925(a) Op. at 17-18.) Upon our review of the record and the Board's decision, we agree with common pleas' reasoning. Therefore, this is not a basis upon which to reverse the Board's decision.

## III.  CONCLUSION

For the foregoing reasons, we discern no error or abuse of discretion in the Board's denial of District's Application. Accordingly, we affirm.

_____
**RENÉE COHN JUBELIRER,** President Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Appeal of Norristown Area
School District from the Decision
Dated September 23, 2020 of the
Municipality of Norristown Zoning
Hearing Board

:
:
:
:
:
:   No. 614 C.D. 2021

Appeal of:  Norristown Area
School District

:
:
:

## O R D E R

**NOW**, August 28, 2023, the Order of the Court of Common Pleas of Montgomery County, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____

**RENÉE COHN JUBELIRER,** President Judge