# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Hasbrouck Sand and Gravel, Inc. and | : | |
| HLC Land Management, LLC, | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Oil Creek Township | : | No. 632 C.D. 2021 |
| Zoning Hearing Board | : | Argued: February 7, 2022 |

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
                    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                    HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                    FILED:  April 11, 2022

Hasbrouck Sand and Gravel, Inc. and HLC Land Management, LLC (jointly, Hasbroucks), two related family businesses, appeal from an order of the Court of Common Pleas of Crawford County (trial court) affirming the denial of a variance by the Oil Creek Township (Township) Zoning Hearing Board (Board). The Hasbroucks seek to expand their existing sand and gravel mining activities into a previously negotiated buffer zone that was determined through mediation, memorialized in a signed agreement, and reflected in a subsequent amendment to the Township's zoning ordinance.  Upon review, we affirm the trial court's order affirming the denial of the variance.

## I. Background

Sometime in or around 2000, the Hasbroucks purchased a former country club and golf course property (Property) in the Township. Memorandum Op., May 14, 2021, Ex. C to Appellants' Br. (Trial Ct. op.) at 1. At that time, the Property was zoned as part of the Township's Suburban Residential Restricted District. Reproduced Record (R.R.) at 148a. The Hasbroucks sought a change in the zoning of the Property to allow mining of sand and gravel, which neighbors of the Property opposed. *Id.* at 148a. Pursuant to a then-recent amendment to the Pennsylvania Municipalities Planning Code (MPC),[1] Sections 609(f) and 908.1, 53 P.S. §§ 10609(f) & 10908.1,[2] the Township formed a nine-member mediation committee (Committee) to meet with a mediator and discuss a possible amicable resolution. R.R. at 148a. The Committee included a member of the Township's Board of Supervisors, the Township's Secretary and Zoning Officer, a member of the Township's Planning Commission, two nearby residents, and two members of the Hasbrouck family, Herb and Bruce Hasbrouck, as well as attorneys for the residents and the Hasbroucks. *Id.*

After a number of meetings and discussions, the Committee members drafted, unanimously approved, and executed a Mediation Committee Report and Agreement (Mediation Agreement), which they submitted to the Township for approval. R.R. at 148a-57a. The Mediation Agreement proposed the formation of two new zoning districts, Rural Economic Development (RED) and Rural Industrial Office (RIO). *Id.* The Property would lie in both zoning districts, with a 200-foot-

---

[1] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

[2] Section 908.1 was added by the Act of December 21, 1988, P.L. 1329.

wide strip of land fronting on the south side of State Route 8 (Route 8) zoned RIO and the remainder of the Property zoned RED. *Id.*

The parties to the Mediation Agreement consented to and proposed to the Township a number of permitted uses in the RED district but proposed only conditionally permitted uses in the RIO district. R.R. at 156a-57a. Of primary significance here, the parties agreed and proposed that sand and gravel mining would be a conditionally permitted use in the RED district, but would not be permitted in the RIO district. *Id.* However, the Hasbroucks agreed not to engage in mining activities in a 400-foot-wide strip along Route 8 (200 feet of RIO district adjacent to Route 8 and 200 feet of buffer zone on the south side of the RIO district). *Id.* In addition, the parties agreed to a "20-year limit" line, located well south of the buffer zone and Route 8, and the Hasbroucks agreed not to mine any closer to Route 8 than that line for a period of 20 years. *Id.* at 150a, 153a-54a & 159a. The record does not reflect whether the Hasbroucks could have succeeded in obtaining either a zoning change or a variance to mine the Property in the absence of the Mediation Agreement.[3]

The Township approved the Mediation Agreement in concept and enacted an amendment to its zoning ordinance, Ordinance No. 1 of 2002 (Ordinance

---

[3] Neighbors of the Property opposed the proposal to change the Property's use from a golf course to a sand and gravel mining business with its attendant noise, dust, and added truck traffic. *Accord* R.R. at 299a-300a (neighbor stating that an appraisal of her property showed a $70,000 reduction in its value since mining activity began on the Property); *id.* at 21a, 303a & 343a (neighbors describing the constant extreme noise and dust generated by the mining activity and stating that they have to keep their doors and windows closed and cannot use the portions of their properties facing the Property); *id.* at 329a (Bruce Hasbrouck acknowledging that dust and noise occur with sand and gravel mining). In addition to the buffer zone, pursuant to the 20-year limit line provided in the Mediation Agreement, neighbors also obtained a 20-year hiatus before any mining would occur on the northern portion of the Property nearest to Route 8, which amounted to more than half of the Property. *See id.* at 150a, 153a-54a & 159a.

No. 1), which largely tracked the terms of the Mediation Agreement. R.R. at 33a-39a. As enacted, however, Ordinance No. 1 provided for only conditionally permitted uses in both the RED and RIO districts,[4] rather than authorizing the proposed permitted uses in the RED district. *Id.* Regarding the 200-foot-wide strip of land immediately south of the RIO district, Ordinance No. 1 provided that mining activities "shall not be . . . closer than 200 feet to the boundary of any zoning district where such operations are not permitted . . . ," *e.g.*, the RIO district. *Id.* at 38a. Thus, although structured differently, in part, from the proposal in the Mediation Agreement, Ordinance No. 1 still allowed the mining activities desired by the Hasbroucks and created the proposed 200-foot buffer zone between mining and commercial activities and a 400-foot total buffer zone between mining activities and Route 8. The Hasbroucks do not point to any specific adverse effect on their use of the Property arising from the slight differences between the ordinance provisions proposed in the Mediation Agreement and those actually enacted by the Township.

By 2019, mining activities on the Property were approaching the buffer zone.[5] R.R. at 291a. The Hasbroucks filed an application for a variance to allow mining activity in the 200-foot buffer zone between the rest of the RED district and the RIO district. *Id.* at 12a-15a. At a hearing before the Board, Bruce Hasbrouck, the Vice President of Hasbrouck Sand and Gravel, Inc. and the General Partner of HLC Land Management LLC, testified on behalf of the Hasbroucks. *Id.* at 288a. He acknowledged that he was a member of the Committee and that he agreed to and

---

[4] Neither party has questioned the legality of creating a zoning district with no permitted uses. Therefore, we do not consider it here.

[5] The record does not indicate whether the Hasbroucks have yet begun mining north of the 20-year limit line.

4

signed the Mediation Agreement on behalf of the Hasbroucks. *Id*. at 295a. He explained that mining the buffer zone would allow the Hasbroucks to enhance the return on their investment in the Property and that once mining activities take place along the edge of the buffer zone, there is no way to go back and mine the buffer zone later, because of the slope that will be created by mining that part of the Property. *Id.* at 291a & 293a. Bruce Hasbrouck testified that the land in the buffer zone is useless to the Hasbroucks if it cannot be mined. *Id.* at 328a.

Following the hearing, the Board issued a decision denying the requested variance (2019 Board Decision). R.R. at 16a-18a. The Board concluded the Hasbroucks failed to show any unique circumstances or conditions of the Property, and their desire for additional profit from mining the buffer zone did not constitute the unnecessary hardship required to justify a variance. *Id.* at 17a (citing *Appeal of Eureka Stone Quarry, Inc.*, 539 A.2d 1375 (Pa. Cmwlth. 1988)). The Board stated that without a showing of unnecessary hardship, there was no need to reach the issue of whether the Hasbroucks created the hardship themselves. R.R. at 17a. Nonetheless, the Board noted Bruce Hasbrouck's participation in and execution of the Mediation Agreement, implying that any hardship was self-created. *See id*.

The Hasbroucks appealed to the trial court but subsequently requested a remand to the Board for a further hearing to submit additional evidence, which the trial court granted. R.R. at 19a. Following the second hearing, the Board again issued a decision denying the variance (2020 Board Decision). *Id*. at 20a-22a. The Board concluded the Hasbroucks failed to establish a unique character or condition of the Property creating an unnecessary hardship, and further, they did not show that they had not created the alleged unnecessary hardship. *Id.* at 22a. The Hasbroucks

5

again appealed to the trial court, which affirmed the Board's decision. *See generally* Trial Ct. op.

This appeal followed.

## II. Issues

On appeal,[6] the Hasbroucks raise several issues, which we reorganize and paraphrase as follows. First, regarding the alleged unnecessary hardship they will incur without a variance, the Hasbroucks assert that the Board erroneously required them to prove it was impossible to develop the buffer zone within the RED district in conformity with the Township's zoning ordinance. They argue that they proved the ordinance inflicted an unnecessary hardship because of the rezoning and their inability to mine in the buffer zone, and because the development anticipated in creating the RIO district has not occurred. Further, they insist their participation in mediation and execution of the Mediation Agreement does not mean the hardship was self-created. We address each issue in turn.[7]

---

[6] Where the trial court has taken no additional evidence, this Court's review is limited to determining whether a zoning board's findings are supported by substantial evidence or whether the zoning board made an error of law in rendering its decision. *Twp. of Exeter v. Zoning Hearing Bd.*, 962 A.2d 653, 659 (Pa. 2009). Further, a zoning board's findings are owed deference, especially as to whether a variance applicant satisfied the unnecessary hardship criterion, in light of the zoning board's expertise and knowledge regarding local conditions. *Marshall v. City of Philadelphia*, 97 A.3d 323, 333 (Pa. 2014); *Tidd v. Lower Saucon Twp. Zoning Hearing Bd.*, 118 A.3d 1, 9 (Pa. Cmwlth. 2015).

[7] The Hasbroucks also assert that the trial court erroneously based its affirmance on issues not included in the 2020 Board Decision, including conclusions in the 2019 Board Decision that were not repeated in the 2020 Board Decision. Appellants' Br. at 48. However, because the trial court took no additional evidence, this Court's review relates solely to the sufficiency of the Board's decision. *See supra* note 6. For this reason, and because we conclude that the Board's findings and conclusions in the 2020 Board Decision are sufficient to support the Board's denial of the variance, we need not resolve the question of whether the trial court properly considered the conclusions in the 2019 Board Decision as well as those in the 2020 Board Decision.

## III. Discussion

### A. Applicable Burden of Proof

"An application for a variance seeks permission to do something which is prohibited by the zoning ordinance. In essence, a variance constitutes an exception, or an overriding of legislative judgment concerning the will of the citizens of the community regarding land use." *Metal Green Inc. v. City of Phila.*, 266 A.3d 495, 506 (Pa. 2021). An applicant for a variance must establish all of the following criteria:

> (1) an unnecessary hardship will result if the variance is denied, due to the unique physical circumstances or conditions of the property; (2) because of such physical circumstances or conditions the property cannot be developed in strict conformity with the provisions of the zoning ordinance and a variance is necessary to enable the reasonable use of the property; (3) the hardship is not self-inflicted; (4) granting the variance will not alter the essential character of the neighborhood nor be detrimental to the public welfare; and (5) the variance sought is the minimum variance that will afford relief.

*Tidd v. Lower Saucon Twp. Zoning Hearing Bd.*, 118 A.3d 1, 8 (Pa. Cmwlth. 2015) (quoting *Tri-Cnty. Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 520 (Pa. Cmwlth. 2014) (citation omitted) (additional quotation marks omitted)); *see also* Section 910.2(a)(1-5) of the MPC,[8] 53 P.S. § 10910.2(a)(1)-(5); *Larsen v. Zoning Bd. of Adjustment*, 654 A.2d 256, 261 (Pa. Cmwlth. 1995) ("Variances are generally granted only under exceptional circumstances and an applicant must satisfy all criteria necessary for the grant of a variance.") (additional citation omitted).

---

[8] Added by the Act of Dec. 21, 1988, P.L. 1329.

As a threshold matter, the parties dispute the nature of the variance at issue. The Board asserts that Ordinance No. 1 expressly precludes mining activities as a use in the buffer zone, and therefore, the Hasbroucks are necessarily seeking a use variance in order to conduct mining in the buffer zone. Appellee's Br. at 7. The Hasbroucks counter that the buffer zone adjacent to the RIO district is simply a setback and that, accordingly, they are seeking a dimensional variance[9] to allow them to expand their conditionally permitted mining activities into the setback area.[10] Appellants' Reply Br. at 3-6.

In support of their position, the Hasbroucks rely on *Hertzberg v. Zoning Board of Adjustment*, 721 A.2d 43, 47 (Pa. 1997) (explaining that "the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation"), and *Tidd*, 118 A.3d at 8 (stating that "[a] dimensional variance involves a request to adjust zoning regulations to use the property in a manner consistent with regulations, whereas a use variance involves a request to use property

---

[9] We reject the Board's argument that the Hasbroucks did not contend they were seeking a dimensional variance until they filed their brief in the trial court. Although the Hasbroucks' variance application did not expressly state which type of variance they were seeking, their description of the variance indicated they were seeking to expand their existing use of the Property into the buffer zone. R.R. at 14a-15a. Moreover, at the Board hearing on remand, the Hasbroucks' counsel expressly stated to the Board that they were requesting a dimensional variance. *See* Appellants' Reply Br. at 1-2 (quoting remand hearing transcript, R.R. at 322a). We conclude the Board was sufficiently on notice of the type of variance the Hasbroucks were seeking.

[10] The Hasbroucks observe that a dimensional variance seeks only "a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations." Appellants' Reply Br. at 3 (first quoting *Hertzberg v. Zoning Bd. of Adjustment*, 721 A.2d 43, 35 (Pa. 1997) (additional quotation marks omitted); and then citing *Tidd*, 118 A.3d at 8). To the extent that the Hasbroucks imply that eliminating the *entire* buffer zone adjacent to the RIO zone is "a reasonable adjustment," we find no support for such a position in either the record or the parties' briefs.

in a manner that is wholly outside zoning regulations"). Appellants' Reply Br. at 3-6. *Tidd* involved a zoning ordinance provision requiring buildings used to shelter horses and areas used to corral or pasture horses to be 100 feet back from lot lines. *Id.* at 3. The property owner sought a dimensional variance in order to encroach into the setback area with pasture, which was a permitted use. *Id.* Here, we agree with the Hasbroucks that, by analogy, their proposed expansion of their conditionally permitted mining operations into the buffer zone, which is essentially a setback, likewise constitutes a request for a dimensional variance, not a use variance.

In *Hertzberg*, our Supreme Court established a more relaxed standard for demonstrating unnecessary hardship for a dimensional variance; in determining whether there is unnecessary hardship sufficient to support a dimensional variance, relevant factors include economic detriment to the applicant from a denial of the variance, the financial hardship that would arise from any work needed to bring the property into compliance with zoning requirements, and the characteristics of the surrounding neighborhood. *Tidd*, 118 A.3d at 8 (citing *Hertzberg*, 721 A.2d at 50). Thus, in seeking a dimensional variance, unreasonable economic hardship to the applicant may be considered, and the applicant is not required to prove the property is valueless or unusable for any purpose without the variance. *Tidd*, 118 A.3d at 8.

Nonetheless, the same criteria set forth above for granting a variance still apply to both use and dimensional variances. *Tidd*, 118 A.3d at 8. Although *Hertzberg* eased the requirements for showing unnecessary hardship to support a dimensional variance, it did not remove them. *Id*. An applicant must still meet each of the criteria for a variance, including unnecessary hardship. *Id*. "Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary

9

hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg*." *Id.* With this legal framework in mind, we examine the Hasbroucks' legal arguments in light of the burden of proof applicable to an application for a dimensional variance.

## B. Unnecessary Hardship

The Hasbroucks first assert that the Board erroneously required them to prove the Property had unique physical characteristics that would make development in conformity with the zoning ordinance impossible. Appellants' Br. at 32. According to the Hasbroucks, the Board then erred further by concluding the Hasbroucks had failed to meet that burden of proof; they insist they met their burden. *Id.* We discern no merit in this argument.

In its decision following the hearing on remand, the Board correctly stated that

> the [Hasbroucks] must demonstrate that the [P]roperty has unique physical characteristics *or conditions peculiar to the [P]roperty that cause an unnecessary hardship*, that there is no possibility the [P]roperty can be developed in strict conformity with the ordinance due to such unique circumstances or conditions and that a variance is necessary to enable reasonable use of the [P]roperty . . . .

R.R. at 22a (emphasis added). This language closely tracked the first two criteria for a variance as set forth in *Tidd*, and we find no error of law in the Board's statement of these two criteria. *See Tidd*, 118 A.3d at 8 (stating that a variance applicant must establish  that "an unnecessary hardship will result if the variance is denied, due to the unique physical circumstances or conditions of the property . . . and a variance is necessary to enable the reasonable use of the property").

10

Even under the somewhat relaxed standards for demonstrating unnecessary hardship in seeking a dimensional variance, the Hasbroucks still had to show that any such hardship arose from unique physical characteristics or conditions of the Property. *See Soc'y Created to Reduce Urban Blight v. Zoning Bd. of Adjustment*, 787 A.2d 1123, 1127 (Pa. Cmwlth. 2001) (observing that "even under the more relaxed *Hertzberg* standards, which allow courts to consider multiple factors in determining if a dimensional variance is justified, the zoning board nonetheless must find some unnecessary hardship arising from the unique physical circumstances *or conditions of the lot* before the zoning board may grant a variance") (emphasis added) (internal citation omitted). In their principal brief, the Hasbroucks do not assert that the Property has unique physical characteristics as such. *See generally* Appellants' Br. Rather, they argue that the *ordinance* is unique, thereby giving rise to a condition of the Property causing an unnecessary hardship in the absence of a variance. *Id.* at 13 (referring to "unnecessary hardship arising from the unique dual zoning"), 34 (asserting that "the [Board] committed an error of law by requiring [the] Hasbrouck[s] to prove that there were such physical conditions of the [P]roperty that it was impossible to develop the setback" in compliance with the ordinance), & 37 (contending that "the [Board] erred by improperly requiring [the] Hasbrouck[s] to prove that the [P]roperty had characteristics which made it impossible to use the [P]roperty in compliance with the ordinance").

However, the Board concluded that the Hasbroucks "did not establish that there are unique physical characteristics or conditions of the [P]roperty that would prevent any possibility that the [P]roperty can be developed in conformity with the ordinance *or that a variance is necessary to enable the reasonable use of the [P]roperty*." R.R. at 22a (emphasis added). Thus, the Board's decision facially

11

applied the variance criteria as set forth in *Tidd*, 118 A.3d at 8. The Board concluded the Hasbroucks failed to sustain *both* their burden to demonstrate a unique physical characteristic imposing unnecessary hardship *and* their burden to prove that a variance was necessary for the reasonable use of the Property. *See* R.R. at 22a.

Assuming, *arguendo*, that the Board erroneously required the Hasbroucks to prove a unique physical condition of the Property that made its use in conformity with the ordinance impossible, any such purported error still would not require reversal, because the Board was within its discretion in finding the evidence inadequate to demonstrate that a variance would be required for reasonable use of the Property. The Board, as factfinder, was the sole judge of the credibility and weight of the evidence. "[A] zoning board determines the credibility of witnesses and weighs their testimony, resolves conflicts in testimony, and, in doing so, may accept or reject the testimony of any witness in part or *in toto*. In making these determinations, a zoning board is free to reject even uncontradicted testimony . . . ." *Metal Green*, 266 A.3d at 506-07. At the second Board hearing on remand, the Hasbroucks offered some conclusory testimony concerning the unique character of the ordinance creating a unique condition of the Property. *See* R.R. at 323a (the Property is the only land in the Township that lies in either the RED or RIO district). However, the Board concluded the Hasbroucks' evidence failed to meet their burden of proof on the need for a variance to enable the reasonable use of the Property. *See* R.R. at 22a. This Court will not reweigh the evidence.[11] *See Broussard v. Zoning*

_____

[11] In *Metal Green Inc. v. City of Phila.*, 266 A.3d 495 (Pa. 2021), our Supreme Court concluded that a zoning hearing board's decision was inadequate where, *inter alia*, the board, although stating the applicant did not establish the criteria for a variance, failed to explain whether the variance applicant's evidence was insufficient to meet its burden of production or its burden of persuasion. *Id.* at 502. Here, the Hasbroucks have not raised this issue. However, we note that their hearing testimony consisted solely of Bruce Hasbrouck's brief self-serving testimony and the

*Bd. of Adjustment*, 831 A.2d 764, 772 (Pa. Cmwlth. 2003), *aff'd*, 907 A.2d 494 (Pa. 2006).

In any event, as explained in the next section, the Hasbroucks also failed to demonstrate that they did not cause their own hardship. Therefore, even assuming the Board erred in concluding that the Hasbroucks failed to demonstrate an unnecessary hardship, any such error was harmless.

### C. Self-Created Hardship

As set forth above, in order to support a variance, the applicant must also establish that any hardship requiring a variance was not self-created. *Tidd*, 118 A.3d at 8. Here, the Board concluded that the Hasbroucks failed to meet that criterion for a variance because they participated in the Committee's mediation and approved and signed the Mediation Agreement on which the Township based Ordinance No. 1. R.R. at 22a. The Hasbroucks insist the hardship purportedly arising from their inability to mine in the buffer zone was not self-created because the Township, not the Mediation Agreement, enacted Ordinance No. 1, and because the hardship resulted from the rezoning and the subsequent absence of the hoped-for development of the RIO district. These arguments lack merit.

Regarding the Mediation Agreement, the Hasbroucks observe that where one purchases property knowing that its zoning precludes the purchaser's intended use, and then seeks a variance from the zoning to allow that use, that circumstance does not constitute self-created harm. Appellants' Br. at 44-46 (citing

---

Township Zoning Officer's verification that the RED and RIO districts do not apply anywhere in the Township except to the Property. *See* R.R. at 288a-95a & 323a-36a. The Board was within its discretion in determining that the Hasbroucks' evidence was insufficient to demonstrate that a variance was necessary for the reasonable use of the Property.

*Wilson v. Plumstead Twp. Zoning Hearing Bd.*, 936 A.2d 1061, 1070 (Pa. 2007))
(additional citations omitted). The Hasbroucks suggest the circumstances of this
case are the same as those where a buyer purchases property with knowledge of its
zoning and then seeks a variance. We disagree.

Contrary to the Hasbroucks' contention, the critical difference here is
the Mediation Agreement. The Hasbroucks bought the Property with knowledge
that its zoning did not permit their desired mining activity, and then they sought a
variance, but importantly, their conduct did not stop there. They agreed to mediate
the issue of a zoning change as members of the Committee, and by negotiating and
executing the Mediation Agreement, they avoided the risk of an unsuccessful request
for a zoning change that could have impacted their investment in the Property.
Through the Mediation Agreement, the Hasbroucks gained the ability to mine the
vast majority of the Property. *See* R.R. at 291a (stating that the area the Hasbroucks
are already mining is "much wider than 200 feet"). In return, they agreed to a 400
foot wide buffer zone along Route 8, and even as to that buffer zone, they gained the
ability to conduct non-mining activities, including commercial development of the
RIO district.

The Hasbroucks implicitly recognize the contractual nature of the
Mediation Agreement, but they contend that to the extent it constitutes a contract, it
is unenforceable for lack of consideration. Appellants' Br. at 46. We disagree.
Notwithstanding the necessity for approval by the Township, the Mediation
Agreement is in the nature of a settlement agreement relating to a conflict among the
Hasbroucks, the Township, and neighboring property owners. *See* R.R. at 148a
(reciting that the Township "decided to organize a mediation team in order to work
towards the resolution of a land use conflict" pursuant to Section 908.1 of the

14

MPC, 53 P.S. § 10908.1, which authorizes mediation for resolution of such conflicts). The compromise of a disputed claim constitutes sufficient consideration to make a settlement agreement enforceable. *See SKF USA, Inc. v. Workers' Comp. Appeal Bd. (Smalls)*, 714 A.2d 496, 500 (Pa. Cmwlth. 1998) (first citing *Cohen v. Sabin*, 307 A.2d 845 (Pa. 1973); and then *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663 (Pa. 1956)); *see also Rivers v. Del. Valley Mut. Cas. Co.*, 175 A.2d 87, 89 (Pa. Super. 1961) (explaining that "[t]he compromise of disputed claims, whether in fact valid or not, furnishes sufficient consideration for an agreement of compromise . . . , the very object of a compromise being to avoid the trouble and risk of that question") (internal citations omitted).

In short, the Hasbroucks entered into a valid and enforceable written agreement in which they promised not to mine in the buffer zone, in return for the ability to mine in the rest of the RED district and engage in commercial development of the RIO district. Although the effectiveness of the Mediation Agreement depended on the Township's approval of that agreement and enactment of the implementing ordinance, the Township *did* approve the Mediation Agreement and *did* enact the implementing ordinance in reliance on the Mediation Agreement's terms. *See* R.R. at 148a. Now, after reaping the benefit of their bargain for nearly two decades, the Hasbroucks are approaching the buffer zone in the course of their mining activities and, tantalized by its potential for added profitability, they are no longer satisfied with the bargain they made. Like the trial court, we can envision no clearer example of a self-created hardship. *See* Trial Ct. op. at 8.

The Hasbroucks also argue that their purported hardship is not self-created because although they signed the Mediation Agreement, they did not agree therein that they would never seek a variance. Appellants' Br. at 47-48. The

Hasbroucks expressly agreed they would not mine in the buffer zone. Seeking a variance to do just that is a flagrant attempt to contravene the Mediation Agreement. Their contrary argument essentially amounts to an assertion that although they made an agreement, they did not agree never to try to evade their obligations under that agreement. That argument is specious at best.

In a related argument, the Hasbroucks assert that although they consented to and signed the Mediation Agreement, that agreement was not binding on them because the Township altered some of the proposed ordinance language suggested in the Mediation Agreement when the Township enacted Ordinance No. 1 with only conditionally permitted uses in the RED district rather than permitted uses as proposed in the Mediation Agreement. Appellants' Br. at 47. However, the Hasbroucks' overriding goal in entering the Mediation Agreement was gaining conditional approval to mine in the RED district. Notably, mining in the RED district was a conditionally permitted use, both as recommended in the Mediation Agreement and as enacted in Ordinance No. 1, and the Hasbroucks achieved their goal when the Township approved that use under the conditions proposed and consented to by the parties, including the Hasbroucks, in the Mediation Agreement. Therefore, we conclude the distinction between the proposed ordinance provisions in the Mediation Agreement and the provisions of Ordinance No. 1 is one without a difference for purposes of the enforceability of the Mediation Agreement.[12] The

_____

[12] Where an alleged failure of performance is immaterial and an agreement has been substantially performed, it provisions remain in effect. *Cimina v. Bronich*, 537 A.2d 1355, 1358 (Pa. 1988) (quoting *Sgarlat v. Griffith*, 36 A.2d 330, 332 (Pa. 1944) ("only material failure of performance by one party discharges the other party . . . an immaterial failure does not operate as such a discharge")) (internal quotation marks and additional citations omitted). Our Supreme Court long ago observed, in describing a *de minimis* breach, that it "would not put on spectacles, to look at breaches in matters unsubstantial and of no great amount one way or the other."

16

Township formed the Committee expressly for the purpose of mediating an agreement on which the Township could rely in resolving the Hasbroucks' request for a zoning change to allow mining on the Property. *See* R.R. at 148a. The Mediation Agreement recommended a resolution, including the creation of the RED district, the RIO district, and the buffer zone, which the Township implemented with only minor changes that were inconsequential to the Hasbroucks' mining activities on the Property. *Id.* at 33a-39a & 148a-57a. The Hasbroucks will not now be heard to disclaim any role in formulating the provisions of Ordinance No. 1.

The Hasbroucks further contend that the Mediation Agreement was premised on the anticipated development of the RIO district and that the passage of time since 2002, with no such development, has removed the reason for the buffer zone and made both the RIO district and the portion of the buffer zone in the RED district useless. *See* Appellants' Br. at 23-24 & 39-41. The Hasbroucks similarly assert that because of the absence of development of the RIO zoned portion of the Property, the buffer zone is no longer needed. *Id.* at 39-41. However, there was no evidence concerning any expected timetable in which the hoped-for development would occur and, thus, no evidence that the intervening years since 2002 constituted a sufficient time to gauge whether the area will ever be commercially developed. The Hasbroucks simply aver, without evidentiary support, that as no development occurred during the years between the creation of the RIO district in 2002 and their

---

*Obermyer v. Nichols*, 6 Binn. 159, 173 (Pa. 1813). We note that the Hasbroucks acquiesced in any inconsistency between the Mediation Agreement's recommendation and the actual language of Ordinance No. 1 by proceeding with their mining activities in the RED district for nearly 20 years without asserting that the ordinance language did not match their expectation in entering into the Mediation Agreement. That acquiescence further illustrates the *de minimis* nature of the difference between the Mediation Agreement's recommended zoning ordinance amendment and the Township's amended ordinance as enacted.

17

variance application in 2019, development is not going to occur, because the "community [is] getting smaller, not larger." R.R. at 290a. In light of the paucity of record evidence on this issue, we cannot conclude that the Board erred by failing to credit the Hasbroucks' assertions.

In addition, the record indicates that the portions of the Property constituting the RIO district and the rest of the buffer zone have been and are presently used by the Hasbroucks to grow corn. R.R. at 338a. Although there was some testimony that the commercial availability of the RIO district was known to some local residents and was "at one time" known to a few realtors, *id.* at 296a & 298a, there was no evidence that it was obvious or was known to anyone else, including any potential developers or commercial business owners.[13]

For all the reasons discussed above, we conclude that the Board did not err in determining that the Hasbroucks failed to meet their burdens of demonstrating that they are subject to an unnecessary hardship and that they themselves did not

_____

[13] In that regard, it is noteworthy that the Hasbroucks continue to own all of the Property, including the portion located in the RIO district. R.R. at 293a-94a, 323a & 327a. In support of the Hasbroucks' contention that commercial development of the RIO district is not feasible, Bruce Hasbrouck testified that no one has approached him about purchasing land in the RIO district for development, and that the community is getting smaller. *Id.* at 290a. On the other hand, there was no evidence of any marketing efforts or other attempts to encourage such development. *See id.* at 295a-96a (stating that the Hasbroucks did not do any advertising of the RIO district). We agree with the Hasbroucks' observation that a property owner is not required to place his property on the market for sale in order to demonstrate that it is not marketable as zoned. *See* Appellants' Br. at 33-34 (quoting *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 642 (Pa. 1983)). Nonetheless, the inability to sell a property is probative of its marketability. *Valley View*, 462 A.2d at 642. Further, we are skeptical that passively retaining ownership of a commercial property and using it as a cornfield, R.R. at 338a, without more, automatically entitles the owner to conclude that commercial development is hopeless because the business world did not, unsolicited, beat a path to his door. However, in light of our disposition of the appeal on other grounds, we do not find it necessary to reach this issue.

18

create that alleged hardship. Accordingly, the Board did not err in denying the requested variance.

## IV. Conclusion

Based on the foregoing analysis, the decision of the Board is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hasbrouck Sand and Gravel, Inc. and : 
HLC Land Management, LLC, :
          Appellants :
           :
       v. :
           :
Oil Creek Township :   No. 632 C.D. 2021
Zoning Hearing Board :

## O R D E R

AND NOW, this 11th day of April, 2022, the order of the Court of Common Pleas of Crawford County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge