# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Paula Canivan,                              :
                    Appellant              :
                                           :    No. 98 C.D. 2020
          v.                               :
                                           :    Submitted: October 29, 2021
Honesdale Borough Zoning Board             :
and Honesdale Community Church,            :
Inc.                                       :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                        FILED: November 15, 2022


          Paula Canivan (Canivan) appeals from the December 10, 2019 order of the Court of Common Pleas of Wayne County (trial court), which affirmed the December 7, 2018 decision of the Honesdale Borough Zoning Hearing Board (ZHB)[1] granting The Honesdale Community Church, Inc.'s (Church) request for dimensional variances from the applicable maximum lot coverage, setback requirements, and planting strip width requirement of the Honesdale Borough Zoning Ordinance (Ordinance),[2] thereby allowing the Church to expand the parking lot on its property.  After thorough consideration, we affirm.

---

[1] This Court precluded the ZHB, which is listed as an appellee in the caption, from filing a brief in this matter based on its failure to comply with this Court's June 3, 2021 order directing it to file a brief in 14 days.

[2] Borough of Honesdale, Pa., Zoning Ordinance, *as amended*, §§ 210-1 – 210-44 (2000), available at https://ecode360.com/12991884 (last visited November 10, 2022).

## Background

The Church owns property located at 206 12th Street (Property), at the corner of 12th and Church Streets in Honesdale Borough (Borough). Reproduced Record (R.R.) at 13a, 16a, 18a; ZHB Decision, Finding of Fact (F.F.) ¶ 1. The Property is located in the Borough's R-5 Residential/Professional Zoning District (R-5 District) and is improved with a church building and a parking lot. R.R. at 13a, 16a; ZHB Decision at 1. Churches and places of worship are allowed as special exception uses in the R-5 District. Ordinance § 210-10(D). Notably, the Church obtained a variance from the ZHB in 1998 for its current 14-space, on-site parking lot. R.R. at 13a, 18a; ZHB Decision, F.F. ¶ 2 & Applicant Exhibit A-6 (1998 variance).[3]

On July 16, 2018, the Church submitted an application to the ZHB requesting three dimensional variances so it could expand its on-site parking lot from 14 to 24 spaces. R.R. at 12a-16a. Specifically, the Church requested the following variances from the Ordinance: (1) to extend the existing parking area to within 1 foot of the easterly boundary, where the Ordinance requires side and rear lot setbacks of 10 feet; (2) to lessen the planting strip along the easterly and southerly boundaries from the required 20 feet to 1 foot and 6 feet, respectively; and (3) to increase the maximum lot coverage from the current 52% to 56%, where the Ordinance provides a maximum lot coverage of 35%. *Id.* at 12a, 14a; *see* Ordinance §§ 210-10(F), 210-19(I). The narrative submitted in support of the Church's application explains, in pertinent part:

---

[3] Applicant Exhibit A-6 appears to be missing from the list of exhibits in the ZHB's decision. *See* ZHB Decision at 3-4. However, the ZHB admitted this exhibit into the record and specifically mentioned the exhibit in its Findings of Fact. *See* ZHB Decision, F.F. ¶ 2; R.R. at 24a, 40a.

**Since 1998[,] significant changes have occurred to the [] Church, the Borough[,] and the neighborhood**. The [] Church's congregation has grown, attendance at services has increased, and the nature of modern life with its emphasis on the automobile has increased the need for parking. **In addition, the Borough has had its traffic patterns significantly altered with the result that Main Street is one way south while Church Street is one way north. Even more significant is the construction of the General Richard J. Tallman [(Tallman)] bridge crossing the Lackawaxen River at Church and [12th] Streets**.

**These changes had an obvious impact on available on-street parking for church activities**. There is no on-street parking on the easterly side of **Church Street north of Central Park, and very few spots on the westerly side of Church Street**. In addition, the construction of the [Tallman] bridge has lessened the availability of the on-street parking on [12th] Street[,] which existed before it was constructed.

Existing off-street parking (14 spots) is provided on the [] [P]roperty to the south of the church building because of the variance granted by the [ZHB] in 1998. However, due to the change in circumstances outlined above[,] the [] Church finds it necessary to increase the size of this parking lot by extending its boundaries in a manner nearly identical to those permitted by the existing variance. This will add [10] parking spaces[,] making the off-street parking capacity of the lot 24 spaces.

R.R. at 13a (emphasis added).

The ZHB held a hearing on the Church's application on October 25, 2018. Keith Larson, the Church's President, testified first in support of the Church's application. He explained that the Church previously submitted a variance application to the ZHB in which it sought to add 14 more parking spaces, for a total of 28 spaces, but the plan was withdrawn after Canivan, one of the Church's

3

neighbors, objected.  R.R. at 46a-47a, 51a-52a, 54a; ZHB Decision, F.F. ¶ 3 & Applicant Exhibit A-8 (prior plan for parking expansion).  Larson confirmed that the Church's current parking lot expansion plan[4] is drastically different than the withdrawn plan due to the Church's attempt to accommodate Canivan's concerns by eliminating the four parking spots along the border with Canivan's property.  R.R. at 47a, 128a-30a, 151a.  Larson then testified that the Church needs the "additional off-street parking because the current parking is insufficient for the number of people that show up on a Sunday morning."  R.R. at 48a; ZHB Decision, F.F. ¶ 5.  In support of this contention, Larson stated that he personally counted the number of cars that showed up for the Church's Sunday morning service each week from the last Sunday in June 2018 through the week prior to the ZHB hearing.  R.R. at 48a-49a, 57a.  The Church submitted into evidence a document outlining the number of cars Larson counted each week, ranging from 15 to 27 in total, which exceeds the Church's current parking lot that has only 14 spaces.  *Id.* at 49a-50a; ZHB Decision, Applicant Exhibit A-9 (attendance for 2018 at Church).  Larson explained that he only counted cars parked outside of the Church's parking lot if he was able to verify that the individuals driving the cars attended the service.  *Id.*

In response to a question about whether the Church was the only user of the parking lot, Larson stated that the Church permits a nearby pharmacy to also use the parking lot during business hours on weekdays.  R.R. at 50a; ZHB Decision, F.F. ¶ 6.  Larson explained that the pharmacy gives the Church "a free will" quarterly donation of $180 in exchange for pharmacy employees' use of the lot.  R.R. at 50a, 63a; ZHB Decision, F.F. ¶ 6.  When asked what would happen if the pharmacy stopped making the quarterly donation, Larson stated the Church would still allow

---

[4] The current parking lot expansion plan and variance application were admitted into the record as Applicant's Exhibit A-10.

the pharmacy's employees to use the lot. R.R. at 50a-51a. Larson indicated that there was no contract between the Church and the pharmacy with respect to the pharmacy's donation and use of the lot. He also noted that it was up to the pharmacy to determine whether it would increase the donation due to any increase in the number of parking spaces. R.R. at 52a-53a; ZHB Decision, F.F. ¶ 6.

Larson noted on cross-examination that the Church's parishioners have to make use of other parking spots in the area when they attend Sunday services. R.R. at 62a. While he could not provide the exact number of other parking spaces available in the vicinity, Larson stated that church attendees are able to park on 12th Street in front of the church building and in front of Canivan's property, directly across the street from the church building, in a grassy area along the riverbank, and on Church Street about a block from the Church. *Id.* at 59a-62a. Larson also stated, in response to opposing counsel's questions about whether the geography of the Property justified the expansion, that the Property is fairly level, with no hills or differences in topography. R.R. at 66a. Larson stated that the Church could continue to use the Property as a church and parking lot without the variances but stated it would be "more difficult" because the construction of the Tallman bridge reduced the number of on-street parking spaces in the area. *Id.* at 69a, 71a-72a. Larson further stated that he had no data or indication that anyone could not attend the Church's services because they could not find parking. *Id.* at 75a. In addition to the current need for parking spaces, Larson also testified that the Church was seeking the 10 additional parking spaces "[t]o allow for church growth" in the future. *Id.* at 76a.

The Church also presented the testimony of Diane Spry, a Borough resident who has been a member of the Church for over 65 years. R.R. at 84a. Spry

5

testified that she attends services every Sunday and observes both how many people regularly attend the services and where they park. *Id.* at 85a-87a. Specifically, she stated that the Church's weekly attendance ranges from 25 to 35 people, 10 to 15 of which on average are children, and could go as high as 50 depending on the time of year and whether it is a holiday.[5] *Id.* at 85a-86a, 105a-06a; ZHB Decision, F.F. ¶ 7. Spry also explained that attendees drive to the Church and based on the number of vehicles she has observed, she opined that the current parking lot is not sufficient to accommodate attendees. R.R. at 86a-88a; ZHB Decision, F.F. ¶ 7. She noted that those who do not get a space in the Church's parking lot have to park on either side of 12th Street, in the grassy area along 12th Street, or on Court Street, if spaces are available. R.R. at 91a-92a.

Spry further testified on cross-examination that when the Tallman bridge was constructed in 2011, the traffic patterns changed, as Church Street became a one-way street. R.R. at 94a. According to Spry, 10 on-street parking spaces were lost along 12th Street due to the construction of the Tallman bridge and the installation of guardrails on either side thereof. *Id.* at 95a-97a. She stated that both the construction of the bridge and the changed traffic pattern had an impact on Church members' parking. *Id.* at 96a. Spry acknowledged that some people do walk to the Church, which would not require use of the parking lot. *Id.* at 108a.

Landscape architect Michael Wood, of Woodland Design Associates Inc., also testified on behalf of the Church. Wood prepared the site plan[6] that the

---

[5] Spry later explained on cross-examination that the Church no longer keeps records of individuals who are baptized members of the Church. She stated that, as of several years ago and to the best of her knowledge, only approximately 19 or 20 people were baptized and considered members of the Church; however, she noted, everyone who attends the Church is treated as or considered to be a member. R.R. at 104a.

[6] The revised parking expansion plan was submitted as Applicant Exhibit A-10. R.R. at 113a; ZHB Decision, Applicant Exhibit A-10 (revised parking expansion plan).

Church submitted along with its application, and he was also involved in the 1998 variance for the Church's original parking lot. R.R. at 109a; ZHB Decision, F.F. ¶ 8. Wood estimated that seven parking spaces in the grassy area along 12th Street were lost due to construction of the Tallman bridge and that four additional on-street parking spaces were lost sometime after 2005. R.R. at 110a-11a, 142a-44a. Wood characterized the site plan he developed as "simply an extension of what the parking lot was from 1998[,]" which is relevant because the ZHB already decided that a parking lot could be placed in the area. *Id.* at 114a, 116a. He testified that the 1998 design plan also had to meet certain requirements regarding property lines and setbacks, as well as proper engineering standards for the health, safety, and welfare of the public. *Id.* at 116a-19a. He then stated that the current site plan is a "comprehensive design" and that he "strove to meet all the requirements that we possibly could, but we could not meet them all." *Id.* at 120a. Wood explained specifically that, because of "the unique conditions of the lot and the shapes and sizes of the buildings," he was unable to meet the Ordinance's requirements for a 20-foot buffer and the maximum lot coverage. *Id.* at 124a; *see also id.* at 120a (including narrowness of the lot and the area between the existing buildings). Further, the plan had to accommodate "the traffic patterns that now exist with one-way traffic on Church Street to one-way traffic on 12th [Street] and that people would be able to get in and out safely[,]" and also "parking that is easier and more negotiable for older citizens" and others who use the Church's facility. *Id.* at 124a-25a.

Wood assured that he took steps to achieve and minimize impacts to the neighboring residential properties with respect to the 20-foot buffer and, in doing

7

so, took several photographs to aid him in his analysis. R.R. at 130a-32a.[7] Wood explained his photos as follows: the first photo (Applicant Exhibit A-13) showed that the proposed expanded parking area is bounded on the south side by an adjoining parking lot (R.R. at 132a-34a; ZHB Decision, F.F. ¶ 4); the second photo (Applicant Exhibit A-14) looked directly east to another neighbor's property, which has a fence across the back of it along the border with the Church (R.R. at 134a-36a; ZHB Decision, F.F. ¶ 4); and the third photo (Applicant Exhibit A-15) looked to the northeast, which showed Canivan's garage (R.R. at 136a). Wood stated that, although Canivan's garage blocks the view of the expanded parking area, that area would nevertheless maintain a 10-foot distance from Canivan's property. R.R at 136a.

Wood noted that many lots in the Borough's R-5 District well exceed the maximum 35% lot coverage, including the Church's lot, which has 52% lot coverage. *Id.* at 138a, 164a-67a. He explained that given the recent demolition of the building and garage on the Property and the Church's plan to return that area to natural vegetation, the 10 additional parking spaces would only increase the impervious lot coverage of the Property by 4%, from 52% to 56% lot coverage. R.R. at 139a-41a; ZHB Decision, F.F. ¶ 9.

On cross-examination, Wood stated that the expanded parking area could be seen from Canivan's property, but Canivan's garage is the closest to the parking area and the buffer would be between the garage and the parking area. R.R. at 152a-55a; ZHB Decision, F.F. ¶ 10; *see also* R.R. at 136a.

---

[7] The photos were submitted into the record as Applicant Exhibits A-13, A-14, and A-15. R.R. at 130a-31a; ZHB Decision, Applicant Exhibits A-13 (photo looking south showing neighboring parking lot), A-14 (photo looking east showing privacy fence), & A-15 (photo looking northeast at Canivan property garage).

Canivan's daughter, Britta Bakos, testified[8] first in opposition to the Church's application. Bakos stated that she currently lives part-time in the Borough with her mother and part-time in New York City. R.R. at 172a. Bakos opposes the Church's application due to privacy, noise, and environmental issues, noting that if more cars park in the Church's parking lot, there will be more noxious fumes and gasoline in their backyard. *Id.* at 173a. She testified that she can see the Church's proposed parking area from her mother's home and that *having the required 20-foot planting strip as a buffer would help alleviate her privacy concerns. Id.* at 175a-76a. Bakos stated that she is familiar with the area and did not believe there was a need for extra parking spaces on the Property, noting that there are approximately six parking spots available on 12th Street, six to eight spots in the grassy area along the river, and four additional spots north of the Tallman bridge. *Id.* at 176a-78a. Further, Bakos has observed that there are still on-street parking spots available on Sunday mornings. *Id.* at 178a-79a; *see also* ZHB Decision, F.F. ¶ 11. On cross-examination, *Bakos admitted that the on-street parking spaces on 12th Street and Court Street are not always available on Sundays.* R.R. at 182a-83a; ZHB Decision, F.F. ¶ 12.

Canivan also testified in opposition to the Church's application, stating that she has owned and resided at 212 12th Street since 1947, which directly abuts the Property.[9] R.R. at 188a; ZHB Decision, F.F. ¶ 13. Canivan noted that she no longer works and is therefore home most of the time to observe what goes on in her neighborhood. R.R. at 189a; ZHB Decision, F.F. ¶ 13. With respect to parking on

<hr>

[8] Bakos provided a written statement that was read at the hearing and admitted into the record as Exhibit I-1. R.R. at 180a-82a, 186a; ZHB Decision, F.F. ¶ 12.

[9] Canivan also provided a written statement that was read at the hearing and admitted into the record as Exhibit I-4. R.R. at 209a-13a; ZHB Decision, F.F. ¶ 15.

the street in the vicinity of the Church, she stated that during the week, 8 to 10 cars park in the grassy area along the river, across from her home, and as many as 6 cars park along 12th Street. R.R. at 189a-90a. However, on Sunday mornings, "there is not much activity" and there are not many cars parked in the vicinity. *Id.* at 190a. On several Sunday mornings, specifically October 14 and 21, 2018, Canivan took pictures of the area around her home and the Church, and these pictures were admitted into evidence. *Id.* at 190a-205a; ZHB Decision, F.F. ¶ 14 & Exhibits I-2 (photos individually labeled "a" through "r"), and I-3 (one photo).

In addition, Canivan testified that the Church's Property slopes downward, approximately two to three feet, to her driveway and garage. R.R. at 206a. It concerns Canivan that she would be able to see the area of the proposed additional parking from her house, and she testified that there needs to be some kind of screening – ideally a fence – between the proposed grassy area for children to play and her property to ensure both privacy and the safety of the children. *Id.* at 207a-08a, 217a-18a. Finally, Canivan testified she is an avid gardener and enjoys spending time outside, and the environmental impact of the Church adding more parking spaces would add pollutants, encroach on her property, and "disrupt [her] way of life." *Id.* at 189a, 210a-11a. Specifically, she complained about the pollutants from idling cars; the potential added motor oil, grease, and gasoline dripping onto the parking lot; the heavy metals from car batteries; and the additional "ice melt" that would be needed in winter. *Id.* at 211a. Canivan stated her belief that the additional parking spaces are "both unnecessary, as we have seen from the pictures, and unwanted." R.R. at 212a; ZHB Decision, F.F. ¶ 15.

At its November 15, 2018 meeting, the ZHB unanimously voted to grant the Church's variance application "as proposed with the condition that the

[Church] provide screening along [] Canivan's back property." Original Record (O.R.), Item No. 9, Decision on Honesdale Community Church, at 2; R.R. at 258a. The ZHB formalized that vote through a written decision issued on December 7, 2018. R.R. at 17a-21a; Appellant's Br., Appendix A. In that decision, the ZHB made the above factual findings based on the testimony offered at the hearing and other evidence entered into the record. The ZHB then made the following relevant conclusions of law:

> 3. The proposed expansion of the Church parking lot is needed to provide for the increased size of the congregation, *both currently and for the future*, *and is also needed due to the reduction of the number of street parking [spots] in the area after 2005.*
>
> 4. The [v]ariances are necessary for the *reasonable use* of the Property as a [c]hurch, and additional off-street parking cannot be constructed on the Property in conformance with the [] Ordinance.
>
> 5. This [ZHB] previously granted a variance in 1998 to allow for the establishment of the existing parking lot, recognizing the *need to provide off-street parking* for the pre[]existing church.
>
> 6. The [v]ariances requested are the *minimum variances* necessary to provide for additional parking and do not have a substantial adverse impact on adjoining properties or the community.
>
> 7. The *concerns* of . . . [Canivan] have been *addressed* by the following condition: that the Church be required to plant evergreen trees as a buffer along the boundary line of the Church and the Canivan [p]roperty line . . . .

*Id.* at 20a; Appellant's Br, Appendix A at A.4.

11

Canivan appealed the ZHB's decision to the trial court, which did not accept any additional evidence.[10] R.R. at 5a-11a. On December 10, 2019, the trial court issued an order, without an accompanying opinion, denying Canivan's appeal and finding in favor of the Church. O.R., Item No. 24; Appellant's Br., Appendix B. In doing so, the trial court

> agree[d] that [the Church's] witnesses and exhibits clearly established that the necessary factual elements are present to provide adequate grounds for granting the variance [sic] under the standards set forth in the Ordinance. Thus, it is evidence [sic] that the [ZHB] found substantial evidence[,] and[,] therefore, the decision of the [ZHB] shall be affirmed.

*Id.* at 1, n.1. Canivan then filed the instant appeal to this Court.[11]

## Issues

Canivan argues that the trial court erred in affirming the ZHB's decision granting the Church's variance application because the ZHB failed to conclude that

---

[10] In her notice of land use appeal, Canivan requested that the trial court receive additional testimony and evidence "due to the inadequate evidence and record presented" at the ZHB's hearing. R.R. at 11a. The trial court denied Canivan's petition by order dated July 8, 2019. *Id.* at 260a.

[11] Where a trial court takes no additional evidence on appeal from a decision of a zoning board,

> our scope of review is limited to determining whether the [zoning b]oard committed an error of law or "a manifest abuse of discretion." *Valley View Civic Association v. Zoning Board of Adjustment*, . . . 462 A.2d 637, 639 ([Pa. ]1983). A zoning board abuses its discretion "only if its findings are not supported by substantial evidence." *Id.* at 640. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

*Pequea Township v. Zoning Hearing Board of Pequea Township*, 180 A.3d 500, 504 n.1 (Pa. Cmwlth. 2018).

12

the Church did not satisfy each of the five criteria necessary for a variance. Canivan further maintains that the ZHB's findings do not support the conclusion that the Church satisfied each of the five criteria for a variance and that there is not substantial evidence of record to support each requirement here.

**Discussion**

Section 910.2(a) of the Pennsylvania Municipalities Planning Code (MPC)[12] provides that

> [t]he board may grant a variance, provided that all of the following findings are made where relevant in a given case:
>
> (1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.
>
> (2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.
>
> (3) That such unnecessary hardship has not been created by the appellant.
>
> (4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently

---

[12] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202. Section 910.2 was added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2.

13

impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2(a).[13]   While a variance applicant must show that unnecessary hardship will result if a variance is denied and that the proposed use will not be contrary to the public interest, our Supreme Court has noted that the grant of a dimensional variance is only a reasonable adjustment of the zoning regulations and of lesser moment than the grant of a use variance:

When seeking a *dimensional variance* within a permitted use, the [applicant] is asking only for a *reasonable adjustment of the zoning regulations* in order to utilize the property in a manner consistent with the applicable regulations.  Thus, *the grant of a dimensional variance is of lesser moment than the grant of a use variance*, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation.

*Hertzberg v. Zoning Board of Adjustment of City of Pittsburgh*, 721 A.2d 43, 47 (Pa. 1998) (emphasis added). Therefore, applicants seeking a dimensional variance, as opposed to a use variance, are subject to *a more relaxed standard with respect to establishing unnecessary hardship*, under which

[c]ourts may consider *multiple factors*, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements[,] and the characteristics of the surrounding neighborhood." *Hertzberg*, 721 A.2d at 50. Although *Hertzberg* eased the requirements for a variance,

---

[13] Through its Ordinance, the Borough has expressly adopted the variance test set forth in Section 910.2(a) of the MPC.  *See* Ordinance § 210-41.

14

it did not remove them. *Tidd v. Lower Saucon Township Zoning Hearing Board*, 118 A.3d 1 (Pa. Cmwlth. 2015). Moreover, despite a more relaxed standard, it is still the case that "[t]he burden on an applicant seeking a variance is a heavy one, and the reasons for granting the variance must be substantial, serious and compelling." *Singer v. Philadelphia Zoning Board of Adjustment*, 29 A.3d 144, 149 (Pa. Cmwlth. 2011).

Although *Hertzberg* sets forth a more relaxed standard for a dimensional variance, it does *not* stand for the proposition that "a variance must be granted from a dimensional requirement that prevents or financially burdens a property owner's ability to employ his property *exactly as he wishes*, so long as the use itself is permitted." *Yeager v. Zoning Hearing Board of the City of Allentown*, 779 A.2d 595, 598 (Pa. Cmwlth. 2001) (emphasis in original)[.]

*Pequea Township v. Zoning Hearing Board of Pequea Township*, 180 A.3d 500, 507 (Pa. Cmwlth. 2018) (emphasis in original).

Here, the ZHB's findings with respect to the criteria necessary for a dimensional variance are supported by the record. We note at the outset that the ZHB, "as fact-finder, is the sole judge of credibility." *Marshall v. City of Philadelphia*, 97 A.3d 323, 331 (Pa. 2014). While the ZHB here did not specifically opine as to the credibility of the witnesses, it accurately described their testimony and implicitly credited that of the Church's witnesses, given its findings of fact and conclusions of law.

In particular, the undisputed testimony of the Church's witnesses demonstrates that *attendance* at Sunday services is anywhere from *25 to 35 people, or even more depending on the time of year*. Larson's testimony establishes that in the weeks prior to the hearing, there were *15 to 27 cars* in the area driven by Church attendees. *There are only 10 parking spaces in the lot*. Further, the *uncontested*

15

*testimony of Larson, Wood, and Spry establish the changing conditions in parking within the Church's immediate vicinity due to construction of the Tallman bridge, specifically the significant loss of available on-street parking, being at least 10 spaces*.

Wood further testified that he was unable to add the parking spaces the Church needed to accommodate its congregation and still meet the Ordinance's requirements, *in particular given the size and narrowness of the lot.* R.R. at 119a-20a, 124a. Wood explained specifically that, because of "*the unique conditions of the lot and the shapes and sizes of the buildings,*" he was unable to meet the Ordinance's requirements for a 20-foot buffer and the maximum lot coverage. *Id.* at 124a; *see also id.* at 120a (*including narrowness of the lot and the area between the existing buildings*). Further, the plan had to accommodate "*the traffic patterns that now exist with one-way traffic on Church Street to one-way traffic on 12th [Street] and that people would be able to get in and out safely*[,]" and also "*parking that is easier and more negotiable for older citizens*" and others who use the *Church's facility. Id.* at 124a-25a. This amounts to substantial evidence to support the ZHB's conclusion that the existing 14-space parking lot is not adequate to support the Church's current or growing congregation, and, in turn, that the dimensional variances are necessary for the reasonable use of the Property.

In a case directly on point, *Daley v. Zoning Hearing Board of Upper Moreland Township*, 770 A.2d 815 (Pa. Cmwlth. 2001), this Court upheld the zoning hearing board's grant of a dimensional variance to a church to allow a buffer zone of 5 feet rather than 50 feet so that the church could add an additional 80 parking spaces. We held that the church demonstrated that "*the parking situation had become a serious hardship to its congregation and had prevented it from reasonable*

16

*use of its property*." *Id*. at 820. We explained that "*the [c]hurch did not create the parking problem*" and that "the parking situation had become a serious hardship to its congregation." *Id*. Since the time the church was originally constructed, "the surrounding neighborhood [had] changed causing the parking problem and creating unnecessary hardship for the church." *Id*. As such, we held that the findings regarding unnecessary hardship were supported by the testimony and that there was no abuse of discretion in granting the dimensional variance. *Id*.

Here, just as in *Daley*, the Church did not create the parking problem, the lack of parking has become a hardship to the Church and its members, and it is prevented from reasonable use of its property without the addition of the parking spaces. Specifically, *the surrounding neighborhood has changed, causing the hardship for the Church since 2005. The Tallman bridge construction caused the loss of 10 on-street parking spaces; Church Street is now a one-way street; and further, as testified by Wood, the uniqueness and shape of the lot was the reason Wood could not meet the Ordinance's 20-foot buffer requirement*s. According to the undisputed evidence, this has caused a significant loss of the available on-street parking *now and for the future* use of the Church. Further, in *Daley*, this Court under the same circumstances granted a dimensional variance. As the ZHB found:

> "*the church needs to expand the parking lot because they don't have adequate off-street parking,*"
>
> "*some attendees have expressed concern about being able to find parking nearby*" and,
>
> "*on-street parking spaces are not always available on Sundays along 12th and Court Streets*"

(ZHB Decision, F.F. ¶¶ 5, 7, 12) (emphasis added).

17

Based on these findings of fact, the ZHB concluded: "[t]he proposed *expansion* of the Church parking lot is *needed* to provide for the increased size of the congregation, *both currently and for the future*, and is also needed *due to the reduction of the number of street parking in the area after 2005*." ZHB Decision at 4 (emphasis added). The ZHB also concluded: *"[t]he [v]ariances are necessary for the reasonable use of the Property as a Church." Id.* (emphasis added).

Moreover, there is ample evidence to support the determinations that the variances requested are the minimum variances necessary to provide for additional parking and will not substantially impair Canivan's use of her property or be detrimental to the public welfare. As Larson testified, and the documents submitted into evidence make clear, the Church withdrew its original application and drastically changed its current plans to reduce the number of additional parking spaces and accommodate Canivan's concerns. R.R. at 46a-47a. The ZHB also conditioned the approval of the variances upon the Church planting evergreen trees as a buffer along the boundary line with Canivan's property, thus alleviating her general concern with being able to see the Church's expanded parking lot from her home. It bears noting that the current variances granted by the ZHB are not much different than the variance previously granted to the Church in 1998. For example, the current variances only increase the maximum lot coverage from 52% to 56%. *See* R.R. at 139a-41a. Wood also testified as to the characteristics of the surrounding neighborhood, in particular the number of other parking lots that exceed the 35% lot coverage in the surrounding area. *Id.* at 138a, 164a-67a. Finally, Wood testified that he designed the plan for the expansion of the Church's parking lot in consideration of not just the Ordinance but "proper engineering standards for [the] health, safety, and welfare of the public." Moreover, he noted the inability to create

18

additional parking in the current lot due to the narrowness of the lot and shape of the buildings. R.R. at 116a-19a.

It is well established that "a zoning board's findings are owed deference particularly its determination that a variance applicant satisfied the criterion for dimensional variances. This is particularly so in light of a zoning board's 'expertise in and knowledge of local conditions.'" *Tidd*, 118 A.3d at 9 (quoting *Marshall*, 97 A.3d at 333).

Precedent also supports the granting of the dimensional variances here. As in *Daley*, the Church clearly meets the criteria for a dimensional variance, even exceeding the standard by meeting the higher standard for a use variance, showing undue hardship by uniqueness of the lot and building. *Zaruta v. Zoning Hearing Board of City of Wilkes-Barre*, 543 A.2d 1282, 1284 (Pa. Cmwlth. 1988). *See also* Section 910.2(a) of the MPC, 53 P.S. § 10910.2(a) (requiring that an unnecessary hardship must arise from physical circumstances, and not the circumstances or conditions generally created by provisions of the zoning ordinance in the neighborhood of the district where the property is located).

The ZHB's findings are clearly supported by substantial evidence for the granting of a dimensional variance. As such, we can find no error of law or abuse of discretion.

Accordingly, we affirm the trial court's order.

_____
PATRICIA A. McCULLOUGH, Judge

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Paula Canivan, :
               Appellant :
                :   No. 98 C.D. 2020
          v. :
                :
Honesdale Borough Zoning Board :
and Honesdale Community Church, :
Inc. :

## O R D E R

AND NOW, this 15th day of November, 2022, the order of the Court of Common Pleas of Wayne County, dated December 10, 2019, is AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge